[No. B231941. Second Dist., Div. Seven. Dec. 17, 2012.]

JACQUELINE ARCE et al., Plaintiffs and Appellants, v.
CHILDRENS HOSPITAL LOS ANGELES et al., Defendants and
Respondents.

[No. B233214. Second Dist., Div. Seven. Dec. 17, 2012.]

JACQUELINE ARCE et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

1458

**COUNSEL**

Law Offices of Shawn A. McMillan, Shawn A. McMillan and Stephen D. Daner for Plaintiffs and Appellants.

Ryan, Datomi & Mosely, Kathryn S. M. Mosely and Dawn Cushman for Defendants and Respondents Childrens Hospital Los Angeles, Sandy Himmelrich, Elizabeth Wilson and Karen Kay Imagawa.

Monroy, Averbuck & Gysler, Clayton C. Averbuck and Jennifer E. Gysler for Defendants and Respondents County of Los Angeles, Rosario Fernandez, Karl Maruyama, Susan Gei, Patricia Ploehn, Laura Shotzbarger, Sydney Tucker, Lori Wikler, Eva Yomtobian, Robert Woolridge, Mendy Camarillo-Valle and Nancy Bryden.

**OPINION**

**ZELON, J.—**

## INTRODUCTION

Appellants Jacqueline Arce, Antonio L. and their children, A.L. and N.L., filed an action alleging that the County of Los Angeles, the Los Angeles County Department of Children and Family Services (DCFS) and Childrens Hospital Los Angeles (CHLA) violated their constitutional rights by detaining both children without judicial authorization or adequate cause. They also alleged that DCFS made knowingly false and malicious statements during dependency proceedings and that a CHLA social worker harassed the parents after the children were returned to their custody. The complaint asserted numerous state and federal claims, including violations of 42 United States Code section 1983 (section 1983). Each defendant filed a demurrer to the complaint.

The trial court sustained the demurrers without leave to amend, concluding that (1) plaintiffs' allegation that A.L. was diagnosed with "Shaken Baby Syndrome" demonstrated that exigent circumstances supported the temporary detention of both children and (2) CHLA was immune from plaintiffs' state law claims pursuant to Penal Code section 11172.

Plaintiffs appeal the judgment dismissing their section 1983 claims and various state law claims. We reverse the judgment and conclude that plaintiffs have adequately stated claims under section 1983, but not under state law.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Summary of Plaintiffs' Complaint*

1. *Summary of factual allegations in plaintiffs' second amended complaint*

In August of 2009, Jacqueline Arce (mother), Antonio L. (father) and their two sons, A.L. and N.L. (the children), filed a complaint alleging numerous federal and state claims against the County of Los Angeles (the County), DCFS, CHLA and numerous individuals employed by each of those entities.

The second amended complaint, filed on April 14, 2010,[2] alleged that, on the morning of Tuesday, September 16, 2008, mother dropped off 11-month-old A.L. at Camp Runnymede Daycare, which was owned and operated by Holly Downs. At approximately 10:00 a.m., mother called Downs to check on A.L. and was informed that he had just finished his breakfast and was about to lie down for a nap.

At approximately 3:00 p.m., Downs called mother and reported that A.L. had " 'fallen off the bed' " and was acting " 'weird.' " One minute later, Downs called mother again and said that paramedics had arrived and wanted to speak to her. The paramedics informed mother that A.L. was being airlifted to CHLA because he was " 'acting inappropriately' " and " 'needed proper treatment.' " Mother and father immediately traveled to CHLA.

When the parents arrived at the hospital, they were met by emergency room social worker Brett McGillivray, who told them that A.L. was undergoing an MRI. A team of doctors informed the parents that A.L. was suffering from seizures and had "bleeding in his brain." The doctors also stated that A.L.'s symptoms could not have been caused by a fall from a bed.

---

[1] Plaintiffs filed separate notices of appeal from the trial court's judgment dismissing the CHLA defendants (case No. B231941) and the judgment dismissing the County of Los Angeles defendants (case No. B233214). Because both appeals arise from the same complaint and the same superior court case (case No. BC420124), we consider the appeals together.

[2] Several months after filing their original complaint, plaintiffs filed a first amended complaint. In March of 2010, the trial court sustained a demurrer to the first amended complaint with leave to amend on the "grounds [of] uncertainty." Thereafter, the plaintiffs filed the second amended complaint.

At 5:10 p.m., the parents and McGillivray called Downs to discuss what had happened to A.L. During the call, Downs "changed her [original] story," stating that A.L. had never fallen off a bed. Downs claimed that she had heard A.L. crying in his crib but that he had eventually stopped. When Downs went to check on A.L., she saw him " 'lying . . . limp like a noodle.' " Upon hearing these statements, McGillivray told the parents to end the call because he believed Downs was lying. After the call ended, McGillivray told the parents that Downs had previously informed paramedics that A.L. had fallen from a changing table.

McGillivray called the police to report suspected child abuse. At approximately 7:00 p.m., officers from the Los Angeles Police Department (LAPD) arrived at CHLA and requested that the parents fill out a criminal report. McGillivray informed the officers that, based on his experience as a social worker, he believed the parents were "acting appropriately for th[e] incident" and were not responsible for A.L.'s injuries. The police interviewed the parents and met with A.L.'s treating physician, who reported that although the child's head trauma was consistent with a fall, more testing was required to identify the specific cause of the injury. Based on the information they had gathered, the officers suspected that Downs had abused A.L.

On the morning of September 17, 2008, A.L. underwent additional tests, including a second MRI, a skeletal exam and an eye exam. Later that day, an ophthalmologist informed the parents that the tests indicated A.L. had retinal hemorrhaging in both eyes and acute subdural hematoma on the left side of his brain, which was causing his seizures. According to CHLA doctors, "these symptoms w[e]re usually indicative of Shaken Baby Syndrome."

After meeting with the ophthalmologist, father called Downs to talk about "what had really happened to A.L." Downs changed her story again, stating that A.L. had been "hitting his head all day with a rack of toys, and . . . fallen from a changing table twice." Shortly after the call, the parents met with emergency social worker Shawn Rivas, who had come to the hospital to interview the parents and observe A.L. A detective told Rivas that the LAPD was charging Downs with aggravated assault based, in part, on the fact that she had "repeatedly changed her story regarding the incident."

While the parents were at the hospital, father had a "personality conflict" with several CHLA employees, including CHLA physician Karen Iwagawa and CHLA social workers Sandy Himmelrich and Elizabeth Wilson. As a result of this conflict, Iwagawa, Himmelrich and Wilson engaged in a "malicious effort to convince police officers" that the parents, and not Downs, had abused A.L.

On Friday, September 19, two days after A.L. had been diagnosed with symptoms that were consistent with Shaken Baby Syndrome, mother was napping in A.L.'s hospital room when she was awakened by two social workers and employees of the hospital. The social workers told mother they were putting a " 'hold' on A.L. because it was unclear how or by who A.L. had been injured." Although the social workers did not have a warrant or court order authorizing the detention of A.L., they told mother to leave the hospital and informed her that she would have to make an appointment with the next available social worker if she wanted to see her son.

While mother was being removed from the hospital, DCFS social worker Eva Yomtobian traveled to the parents' home, where mother's sister and brother-in-law, Jessica Acre-Gomez and Ignacio Gomez (the Gomezes), were taking care of A.L.'s three-year-old sibling, N.L. Yomtobian told the Gomezes that she had a warrant to detain N.L., which was not true, and let herself into the home. Yomtobian then threatened to arrest the Gomezes and detain their children, Isaac and Ignacio, if they did not cooperate. Based on these threats, the Gomezes permitted Yomtobian to conduct a search of the parents' home, which lasted two hours. At the end of the search, Yomtobian took custody of N.L. and placed him in a foster home. While in the custody of DCFS, N.L. was subjected to a physical examination that was conducted without the parents' consent.

After the parents were informed that DCFS had detained N.L., they repeatedly called Yomtobian to find out where their son had been placed. Yomtobian waited two days before returning these calls. On the morning of Sunday, September 21, Yomtobian gave the parents the number of N.L.'s foster home. When the parents called N.L., he sobbed uncontrollably.

On Monday, September 24, four days after A.L. and N.L. were detained, DCFS filed a petition in juvenile court seeking jurisdiction over the children pursuant to Welfare and Institutions Code section 300. Yomtobian, who was angry at the parents for "question[ing] her authority and motives," included numerous false statements in the petition and an accompanying detention report, alleging, among other things, that (1) the parents could not explain how A.L. was injured; (2) A.L.'s injuries occurred through the result of the parents' deliberate, unreasonable and neglectful conduct; and (3) the evidence collected by DCFS "clearly indicat[ed]" that the parents had physically abused A.L. and that there was a "very high risk" they would engage in similar conduct in the future. Yomtobian also withheld "important exculpatory information," including the fact that the LAPD was "treating daycare owner Holly Downs as its primary suspect, and increased the charges to aggravated assault following their investigation."

That same day, the juvenile court held a detention hearing and found there was no evidence to support DCFS's allegation that the parents caused A.L.'s injuries. The court ordered DCFS to immediately release A.L. and N.L. to their parents. Despite the juvenile court's findings, DCFS refused to dismiss the petition and continued to seek jurisdiction over A.L. and N.L.

Two weeks after A.L. and N.L. were returned to the parents' custody, A.L. caught his foot in his walker, bruising his ankle. Three days later, on October 9, A.L. developed a rash and mother brought him to his pediatrician, Dr. DeSilva. While diagnosing the rash, DeSilva noticed the bruise and asked what had occurred. Mother explained that A.L. had hurt himself while riding his walker. Although DeSilva was unconcerned about the injury, he told mother that the walker was not safe for A.L.

The next day, CHLA social worker Wilson called mother and instructed her to bring A.L. to the emergency room to allow doctors to conduct tests on A.L.'s foot "because it was probably broken." Mother was worried that DCFS intended to detain A.L. again and told Wilson she could not bring the child to the hospital until father returned from work. When father arrived at the home, he called Wilson to ask what was going on. Wilson initially told father that mother called her and said she thought A.L.'s foot might be broken. When mother denied having called Wilson, Wilson changed her story, claiming that Dr. DeSilva had told a CHLA physician that he suspected the parents had injured A.L.'s foot. Father questioned why Wilson had changed her story and she began to laugh and threatened to take away the children.

Mother called another social worker and apprised her of the situation. The social worker told mother she should take A.L. to a hospital because DCFS "simply wanted to get A.L. checked out by a doctor." Shortly after this call, Wilson called mother again and told her that a nurse and social worker were traveling to her house to examine A.L. and, if necessary, take him to the emergency room. A DCFS nurse and social worker arrived at the home, examined A.L., took pictures of his foot and directed parents to take him to the hospital. The parents felt pressured to comply with this request and brought A.L. to Holy Cross Hospital, where the "doctors were very upset that they had to run x-rays on a bruise." Several weeks later, the parents "received a letter from DCFS regarding the incident that stated there was no evidence of abuse or neglect."

In November and December of 2008, DCFS submitted additional reports to the juvenile court that repeated the false allegations that appeared in the Welfare and Institutions Code section 300 petition and the detention report. These new reports also falsely alleged that a prior referral of abuse had been substantiated against the parents and that father had acted violently toward

DCFS during the investigation of A.L.'s bruised ankle. The reports recommended that the juvenile court deny reunification services to the parents.

On March 18, 2009, the juvenile court held a jurisdictional hearing and dismissed DCFS's Welfare and Institutions Code section 300 petition based on "insufficient evidence." Despite the dismissal, DCFS continued to harass the parents, which caused them to move to a new city.

### 2. *Summary of causes of action*

The second amended complaint alleged numerous federal and state claims against the County, DCFS (collectively County defendants) and CHLA, including violations of 42 United States Code sections 1983, 1985 and 1986, assault, battery, false imprisonment, negligence, fraud, violation of state civil rights, abduction of a child, intentional infliction of emotional distress, invasion of privacy and declaratory relief.

Plaintiffs' section 1983 claim alleged three separate violations arising from the detention of A.L. and N.L. First, A.L. alleged that County social workers, acting in collaboration with CHLA, had violated his Fourth Amendment rights by detaining him at the hospital without judicial authorization. Second, N.L. alleged that County social workers had violated his Fourth Amendment rights by removing him from his home without judicial authorization. Third, the parents and the children alleged that County social workers had violated their Fourteenth Amendment rights to familial association by (1) removing the children without authorization or proper justification and (2) "maliciously falsifying evidence, and presenting fabricated evidence to the court, and maliciously refusing to provide exculpatory evidence during the pendency of the dependency proceedings." The complaint also included a separate section 1983 *"Monell"* claim alleging that the County had established policies and procedures that caused the deprivation of the plaintiffs' constitutional rights.[3]

The plaintiffs' state law claims were predicated on various categories of allegedly unlawful conduct, including (1) the warrantless seizure and detention of A.L. and N.L.; (2) fabricating statements during the pendency

---

[3] In *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658 [56 L.Ed.2d 611, 98 S.Ct. 2018], the Supreme Court held that "Section 1983 does not assign liability to a local government under a respondeat superior theory, but the entity may be liable if the constitutional violation was caused by its official policy, practice, or custom." (*Kerkeles v. City of San Jose* (2011) 199 Cal.App.4th 1001, 1015–1016 [132 Cal.Rptr.3d 143] (*Kerkeles*).)

proceedings; (3) negligently placing N.L. in an unsuitable foster home;[4] and (4) harassing the parents about A.L.'s bruised ankle.

### B. *Demurrers to the Second Amended Complaint*

The County defendants and CHLA filed separate demurrers to the second amended complaint. The County defendants argued that they were immune from liability for all of the conduct alleged in the complaint, including the instigation of dependency proceedings, statements made during dependency hearings and foster care placement decisions. They also argued that many of plaintiffs' claims were uncertain because the allegations in the complaint failed to specify which County employees had engaged in the unlawful conduct.

CHLA's demurrer argued that it was immune from suit under Penal Code section 11172 because all of plaintiffs' claims were predicated on conduct that was committed in furtherance of state-mandated child abuse reporter duties. (See Pen. Code, § 11166, subd. (a).) CHLA also argued that plaintiffs' claims were uncertain because they did not sufficiently identify which specific individuals had committed the unlawful conduct.

During oral argument, the court informed the parties that it was inclined to sustain both demurrers with leave to amend because the complaint demonstrated that exigent circumstances supported the seizure of A.L. and N.L. Although neither defendant had raised the issue in their demurrers, the court explained that plaintiffs had "alleged facts that indicate that defendants acted with justification in taking custody of the minor children. Namely, [paragraph 40 of the complaint alleges] that the minor plaintiff A.L. was diagnosed with 'Shaken Baby Syndrome'. . . ."[5]

In response to the court's statement, plaintiffs' counsel argued that the allegations in the complaint showed that there were questions of fact as to whether any exigency supported the children's warrantless seizure. Specifically, counsel noted that, at the time of A.L.'s detention, two other social workers and the LAPD had concluded that Holly Downs was at fault

---

[4] The complaint alleged that N.L. had been repeatedly struck during his stay at the foster home and pleaded several claims against the foster parent. The foster parent is not a party to this appeal.

[5] In its appellate brief, the County defendants assert that their demurrer to the second amended complaint argued that "the diagnosis of Shaken Baby Syndrome [provided] County Defendants [with] sufficient exigency to place a hospital hold on A.L. and remove N.L. from his home." We have reviewed the demurrer and the memorandum filed in support of the demurrer. Neither filing asserts that A.L.'s diagnosis of Shaken Baby Syndrome or any other exigent circumstance justified the children's detention.

for A.L.'s injuries. Moreover, the children were not detained until two days after A.L. had been diagnosed with Shaken Baby Syndrome.

The court rejected these arguments, explaining: "Look, you've established that this baby is in a life threatening situation . . . . [¶] Now, once you've established that, . . . the County has a very, very strong duty to protect that child . . . . [¶] So you have established . . . that there is a very, very strong reason for the County to get involved. So what you're saying to me is, oh, yeah, the child could be dead. And if this same event were to occur again the child could very well be dead. But several people think that the mother is okay. So you're saying, then that the County should then take different action [than] they took. All right. I'm saying that once you've established that you have a child that is in grave circumstances, that could be dead, that could die based on what has happened, thus far, that puts a really strong . . . duty on the part of the County. . . . And your paragraph 40 allegation is something that carries great weight in terms of justifying what the County did."

The court cited two additional reasons for sustaining the demurrers. First, it agreed with the defendants' assertion that plaintiffs' claims were "uncertain" because the allegations "lump all of the [defendants] together, without any specification as to which defendant was responsible for what actions." Second, the court noted that the defendants were immune from any claim based on " 'presenting perjured testimony' and 'fabricating evidence,' " or any conduct related to the "investigation of the child abuse reports pursuant to . . . statutory dut[ies]."

At the conclusion of the hearing, plaintiffs' counsel asked the court to clarify whether the "demurrer [was] sustained essentially on the basis of uncertainty . . . or . . . on more substantive grounds like immunities." The court explained that the demurrers had been sustained because the allegations were uncertain and the "alleged facts indicate that the defendant acted with justification; again at paragraph 40." The court acknowledged that the state law claims pleaded against CHLA, which were based on conduct that occurred after DCFS returned custody of A.L. and N.L. to the parents, were "probably adequately pled," but requested that the claims be "cleaned up" in the third amended complaint.

### C. *Third Amended Complaint*

#### 1. *Summary of the third amended complaint*

On July 13, 2010, plaintiffs filed their third amended complaint, which reasserted most of the allegations and claims that appeared in the second amended complaint. However, in an attempt to comply with the trial court's

prior directives, the third amended complaint included additional allegations identifying which specific defendants had engaged in the unlawful conduct.

The third amended complaint also removed several factual allegations that appeared in the prior version of the pleading. In the "Common Allegations" section of the complaint, plaintiffs removed the paragraph stating that, on the evening of September 17th, doctors informed the parents that A.L. was exhibiting symptoms that are "usually indicative of Shaken Baby Syndrome." They also removed the allegation that social workers told mother that A.L. was being placed on hold "because it was unclear how or by whom A.L. had been injured."[6]

### 2. *Demurrers to the third amended complaint*

The County defendants and CHLA each filed a demurrer to the third amended complaint that raised the same arguments that were presented in their demurrers to the second amended complaint. Specifically, the defendants argued the plaintiffs' claims were uncertain and that they were immune from liability for all of the conduct alleged in the complaint. In addition, CHLA argued that the plaintiffs had improperly attempted to avoid the trial court's prior ruling by removing the allegation that A.L. was diagnosed with Shaken Baby Syndrome. CHLA contended that, under California's "sham pleading" rules, this allegation had to be read back into the third amended complaint.[7]

The court agreed that it was required to read the omitted allegation back into the third amended complaint and affirmed its prior ruling that A.L.'s diagnosis of Shaken Baby Syndrome defeated all of the claims alleged against the County defendants: "Social workers may constitutionally remove the child from custody of a parent without prior judicial authorization if the information they possess provides reasonable cause to believe that the child is in imminent danger. The [plaintiffs'] claims against the [County defendants] are based on allegations that the social workers, without the consent of the

---

[6] The third amended complaint removed additional allegations that are not directly relevant to this appeal.

[7] " ' "Generally, after an amended pleading has been filed, courts will disregard the original pleading. [Citation.] [¶] However, an exception to this rule is found . . . where an amended complaint attempts to avoid defects set forth in a prior complaint by ignoring them. The court may examine the prior complaint to ascertain whether the amended complaint is merely a sham." [Citation.] The rationale for this rule is obvious. "A pleader may not attempt to breathe life into a complaint by omitting relevant facts which made his previous complaint defective." [Citation.] Moreover, any inconsistencies with prior pleadings must be explained; if the pleader fails to do so, the court may disregard the inconsistent allegations.' [Citation.] [¶] The foregoing rule 'is intended to prevent sham pleadings omitting an incurable defect in the case. . . .' " (*Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 945–946 [65 Cal.Rptr.2d 777] (*Berman*).)

minor[s'] parents, [seized A.L. and N.L.]. . . . What plaintiffs leave out in their 3rd amended complaint . . . is the allegation that A.L., prior to any of the alleged conduct of the defendants, was diagnosed with 'Shaken Baby Syndrome' and that's based on paragraphs 39 and 40 of the [second] amended complaint. . . . This allegation must be read into the present complaint. Accordingly, it appears that the alleged conduct of defendant social workers was lawful because the diagnosis of A.L. of 'Shaken Baby Syndrome' would reasonably indicate that A.L. and his brother N.L. were under immediate danger of physical harm and possibly in need of medical attention. . . . [Therefore], it was legally and constitutionally correct for defendants to take N.L. and A.L. into custody without prior judicial authorization and so the demurrer to all . . . causes of action would be sustained . . . without leave to amend."

The court also explained that A.L.'s diagnosis of Shaken Baby Syndrome established that CHLA was immune from plaintiffs' state and federal claims under Penal Code section 11172: "[T]he immunity [provided in section 11172] applies not just to the act of reporting child abuse, it also applies to activities giving rise to the report. . . . Also, the immunity applies to acts that occur after the submission of the mandated report. . . . [T]he state act contemplates that mandated reporters may be involved in communications beyond the initial 'required' report. So the immunity covers acts beyond just the submission report. It covers more than just one person . . . and the immunity applies also to federal civil rights causes of action. . . . So these defendants, as healthcare providers/personnel, are required to report child abuse. Immunity attaches to the activities related to the reporting of the suspected child abuse, observation, examination or treatment of the victim. All of the alleged conduct of the [CHLA defendants] is related to the acts of reporting child abuse, including observation and examination of the minor plaintiffs. . . . So the problem is the 'Shaken Baby Syndrome' findings do in fact establish the privilege."

The court did, however, allow the plaintiffs to submit supplemental briefing on the issue of whether A.L.'s diagnosis of Shaken Baby Syndrome was, standing alone, sufficient to defeat their section 1983 claims. In their supplemental briefs, plaintiffs argued that (1) the issue of whether exigent circumstances supported the warrantless detention of the children involved questions of fact that could not be resolved on demurrer; (2) the trial court failed to address their alternative section 1983 claim, which alleged that the County defendants had made knowingly false statements during the dependency proceedings; and (3) the immunity described in Penal Code section 11172 did not apply to federal section 1983 claims.

After reviewing the supplemental brief, the trial court entered an order dismissing every claim in the third amended complaint except the fourteenth

cause of action, which sought declaratory relief, and the eighth cause of action, which asserted a derivative section 1983 *Monell* claim against the County. The court elected not to dismiss those causes of action because (1) it concluded that declaratory relief claims are not subject to dismissal on demurrer and (2) the County had not filed a demurrer to the eighth cause of action.

### 3. *The County defendants' motion for judgment on the pleadings regarding the* Monell *claim and entry of final judgment*

Shortly after the court entered its ruling on the demurrers, the County filed a motion for judgment on the pleadings seeking dismissal of the plaintiffs' section 1983 *Monell* claim. The County argued that "in light of th[e trial] court's rulings on the defendants' demurrers, the eighth cause of action is not a viable claim because there is no constitutional violation." The court granted the motion and dismissed the claim without leave to amend. The plaintiffs then agreed to dismiss their sole remaining claim for declaratory relief and the court entered a final judgment.

## DISCUSSION

Plaintiffs have only appealed the trial court's dismissal of five claims alleged in their third amended complaint. In regards to the County defendants, plaintiffs appeal the dismissal of their section 1983 claim (the fifth cause of action) and their derivative *Monell* claim (the eighth cause of action). In regard to the CHLA defendants, plaintiffs appeal the dismissal of their section 1983 claim (the fifth cause of action) and three state law claims—intentional infliction of emotional distress, stalking and invasion of privacy (the 11th, 12th and 13th causes of action). Each of these state law claims is predicated on conduct that Elizabeth Wilson, a social worker at CHLA, allegedly committed after A.L. and N.L. were returned to the parents' custody.[8]

### A. *Standard of Review*

We independently review the trial court's ruling sustaining a demurrer without leave to amend (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 5 [40 Cal.Rptr.3d 205, 129 P.3d 394]) and "must assume the truth of the complaint's properly pleaded or implied factual allegations. [Citation.] . . . In addition, we give the complaint a reasonable interpretation, and read it in context. [Citation.] If the trial court has sustained the demurrer, we determine

---

[8] In their appellate briefs, plaintiffs specifically acknowledge that although the third amended complaint alleges numerous additional causes of action against both sets of defendants, they are only seeking review of the trial court's dismissal of the five causes of action listed above.

whether the complaint states facts sufficient to state a cause of action. If the court sustained the demurrer without leave to amend, as here, we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. [Citation.] If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred. [Citation.] The plaintiff has the burden of proving that an amendment would cure the defect. [Citation.]" (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].)

In regards to plaintiffs' section 1983 claim, we " 'apply federal law to determine whether [the] complaint [has pleaded] a cause of action . . . sufficient to survive a general demurrer.' [Citations.] According to federal law, 'we are required to construe complaints under [section 1983] liberally.' [Citation.] 'To uphold a dismissal [for failure to state a claim for relief, the federal counterpart of our general demurrer], it must appear to a certainty that the plaintiff would not be entitled to relief under any set of facts that could be proved.' [Citation.]" (*Bullock v. City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1088 [271 Cal.Rptr. 44].) Therefore, dismissal is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him to relief." (*Osborne v. District Attorney's Office for Third Judicial Dist.* (9th Cir. 2005) 423 F.3d 1050, 1052; see *Jensen v. City of Oxnard* (9th Cir. 1998) 145 F.3d 1078, 1082 (*Jensen*).) In line with California practice, the court accepts the allegations in the complaint as true and construes the allegations, and any reasonable inferences that may be drawn from them, in the light most favorable to the plaintiff. (*Adams v. Johnson* (9th Cir. 2004) 355 F.3d 1179, 1183; *Jensen, supra*, 145 F.3d at p. 1082.)

B. *The Trial Court Erred in Dismissing Plaintiffs' Section 1983 Claims Against the County Defendants*

1. *Summary of section 1983 claims against the County defendants*

Plaintiffs contend that the trial court erred in dismissing their fifth and eighth causes of action against the County defendants, which assert violations of section 1983. Plaintiffs' fifth cause of action alleges three separate violations of section 1983. First, A.L. and N.L. each allege that County social workers violated their individual Fourth Amendment rights by removing them from their parents' custody without judicial authorization or adequate cause. In addition, mother, father and their children allege that County social workers violated their Fourteenth Amendment rights to familial association when they (1) seized A.L. and N.L. without judicial authorization or adequate

cause and (2) fabricated statements during the dependency proceedings. Plaintiffs' eighth cause of action alleges that, under *Monell, supra,* 436 U.S. 658, the County is liable under section 1983 because its policies, practices, customs and procedures "were the moving force behind" the constitutional violations committed by the County social workers.

Plaintiffs have not challenged the trial court's decision to incorporate the allegation that A.L. was diagnosed with Shaken Baby Syndrome into the third amended complaint. They argue, however, that the trial court erred in concluding that, as a matter of law, this diagnosis justified the County defendants' warrantless detention of both children.[9] In addition, they argue that the trial court failed to address whether they properly stated a section 1983 cause of action against the County defendants by alleging that County social workers fabricated statements during the dependency proceedings.

> ## 2. The trial court erred in concluding that plaintiffs failed to state a section 1983 claim against the County defendants

### a. Summary of section 1983

Title 42 United States Code section 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

 "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." (*West v. Atkins* (1988) 487 U.S. 42, 48 [101 L.Ed.2d 4, 108 S.Ct. 2250].) " 'State courts look to federal law to determine what conduct will support an action under section 1983. [Citation.]' " (*Weaver v. State of California* (1998) 63 Cal.App.4th 188, 203 [73 Cal.Rptr.2d 571].) "The threshold inquiry [in analyzing a section 1983 claim] is whether the evidence

---

[9] Both sets of defendants assert that we should dismiss this appeal because plaintiffs' appellate briefs do not acknowledge that the court concluded that the third amended complaint was a sham pleading insofar as it removed the allegation regarding A.L.'s diagnosis of Shaken Baby Syndrome. Although plaintiffs' opening appellate briefs do not specifically reference the sham pleading issue, they argue that their prior allegation that A.L. was diagnosed with Shaken Baby Syndrome is not sufficient to defeat their section 1983 claims. We view this as a concession by plaintiffs that the trial court did not err in reading that allegation into the third amended complaint.

establishes that appellants have been deprived of a constitutional right." (*Duchesne v. Sugarman* (2d Cir. 1977) 566 F.2d 817, 824 (*Duchesne*).)[10]

### b. *Summary of constitutional guarantees protecting parental custody rights*

■ " 'Parents and children have a well-elaborated constitutional right to live together without governmental interference.' [Citation.] 'The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies.' [Citation.]" (*Rogers v. County of San Joaquin* (9th Cir. 2007) 487 F.3d 1288, 1294 (*Rogers*).) This "right to family association" (*Wallis v. Spencer* (9th Cir. 2000) 202 F.3d 1126, 1138, fn. 8 (*Wallis*)) requires "[g]overnment officials . . . to obtain prior judicial authorization before intruding on a parent's custody of her child unless they possess information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.' [Citation.]" (*Mabe, supra,* 237 F.3d at pp. 1106–1107; see *Rogers, supra,* 487 F.3d at p. 1294 ["Officials violate [the Fourteenth Amendment] if they remove a child from the home absent 'information at the time of the seizure that establishes "reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." ' [Citation.]"].)

"The Fourth Amendment also protects children from removal from their homes [without prior judicial authorization] absent such a showing. [Citation.] Officials, including social workers, who remove a child from its home without a warrant must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to

---

[10] Under section 1983, government officials are generally entitled to "qualified immunity," which "shields [them] from liability for civil damages if (1) the law governing the official's conduct was clearly established; and (2) under that law, the official objectively could have believed that her conduct was lawful." (*Mabe v. San Bernardino County, Dept. of Public Social Services* (9th Cir. 2001) 237 F.3d 1101, 1106 (*Mabe*).) For the purposes of this appeal, however, the County defendants have not argued that plaintiffs' allegations demonstrate they are entitled to qualified immunity, which "is an affirmative defense against section 1983 claims." (*Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 342 [54 Cal.Rptr.2d 772].) Instead, they have argued only that the facts pleaded in the complaint establish that no constitutional violation occurred. (See *Gary v. Braddock Cemetery* (3d Cir. 2008) 517 F.3d 195, 207, fn. 4 ["In order to state a constitutional claim under Section 1983, a plaintiff must establish an underlying constitutional violation."].) As a result, we need not consider whether qualified immunity existed under the circumstances presented here.

obtain a warrant."[11] (*Rogers, supra*, 487 F.3d at p. 1294; see *M.L., supra*, 172 Cal.App.4th at p. 527 ["Social workers constitutionally may remove a child from the custody of a parent without prior judicial authorization if the information they possess at the time of seizure provides reasonable cause to believe that the child is in imminent danger."].) Because "the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children," we may "analyze [the claims] together." (*Wallis, supra*, 202 F.3d at p. 1137, fn. 8.)

■ "Serious allegations of abuse that have been investigated and corroborated usually give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody' if they might again be beaten or molested during the time it would take to get a warrant. [Citation.] However, an official's prior willingness to leave the children in their home militates against a finding of exigency . . . ." (*Rogers, supra*, 487 F.3d at pp. 1294–1295.) "Moreover, [officials] cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been—or will be—committed." (*Wallis, supra*, 202 F.3d at p. 1138, citing *Sevigny v. Dicksey* (4th Cir. 1988) 846 F.2d 953, 957 [child abuse investigator had duty to investigate information that would have clarified matters prior to separating children from their parents].)

### c. *The complaint sufficiently states a constitutional violation*

The County defendants do not dispute that A.L. and N.L. were removed from their parents' custody without judicial authorization. They argue, however, that the trial court correctly concluded that, as a matter of law, these warrantless seizures did not violate the constitution because plaintiffs' allegation that A.L. was diagnosed with Shaken Baby Syndrome demonstrates that officials had reasonable cause to believe the children were likely to experience serious bodily harm if left in their parents' custody. Implicit in the

---

[11] These constitutional limitations are effectively codified in Welfare and Institutions Code section 306, subdivision (a)(2), which "empowers a social worker to take a child into temporary custody under certain circumstances, without a warrant, if the child is in immediate danger." (*M.L. v. Superior Court* (2009) 172 Cal.App.4th 520, 527 [90 Cal.Rptr.3d 920] (*M.L.*); see Welf. & Inst. Code, § 306, subd. (a)(2) ["Any social worker in a county welfare department . . . may . . . [¶] . . . [¶] (2) Take into and maintain temporary custody of, without a warrant, a minor . . . who the social worker has reasonable cause to believe is a person described in subdivision (b) or (g) of Section 300, and the social worker has reasonable cause to believe that the minor has an immediate need for medical care or is in immediate danger of physical or sexual abuse or the physical environment poses an immediate threat to the child's health or safety."].)

court's ruling is a finding that reasonable cause existed to believe that the parents were responsible for A.L.'s injuries.[12]

As a preliminary matter, we note that determining whether an official had "reasonable cause to believe exigent circumstances existed in a given situation . . . [is a] 'question[] of fact to be determined by a jury.' [Citation.]" (*Mabe, supra,* 237 F.3d at p. 1108; see *Wallis, supra,* 202 F.3d at p. 1138.) Generally, "[q]uestions of fact may be resolved [at the pleadings stage] only when there is only one legitimate inference to be drawn from the allegations of the complaint." (*TracFone Wireless, Inc. v. County of Los Angeles* (2008) 163 Cal.App.4th 1359, 1368 [78 Cal.Rptr.3d 466]; see *Jensen, supra,* 145 F.3d at p. 1082 [dismissal of § 1983 claim under 12(b)(6) motion (Fed. Rules Civ.Proc., former rule 12(b)(6)) is only appropriate if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of [the] claims that would entitle [him to] relief"].) Therefore, for the purposes of this case, we must determine whether the only legitimate inference to be drawn from plaintiffs' factual allegations is that County social workers had reasonable cause to believe that, absent an interference with parental custody, the children were "likely to experience serious bodily harm in the time that would be required to obtain a warrant." (*Rogers, supra,* 487 F.3d at p. 1294.)

■ Several facts pleaded in the complaint, which we must accept as true and view in the light most favorable to plaintiffs, undermine a reasonable belief that the parents presented an imminent threat to their children. First, plaintiffs allege that, prior to the children's detention, several individuals investigating the matter concluded that the parents had not caused A.L.'s injuries. According to the complaint, emergency social worker Brett McGillivray interviewed the parents and, based on his professional experience, concluded that they were acting appropriately and had engaged in no wrongdoing. Instead, McGillivray suspected that Holly Downs, who operated the daycare center that A.L. attended, had inflicted the injury. This belief was allegedly based on the fact that (1) Downs was caring for A.L. at the time he began exhibiting signs of trauma and (2) Downs had repeatedly changed her story about what had happened to A.L. on the day in question.

The complaint further alleges that the LAPD also interviewed the parents and agreed with McGillivray's conclusion that Downs, not the parents, had injured A.L. Based on the facts gathered in their investigation, the police charged Downs with aggravated assault. Finally, a second emergency social worker, Shawn Rivas, allegedly observed that A.L. appeared comfortable in the presence of his parents and elected to leave the child in their care.

---

[12] The trial court ruled that A.L.'s diagnosis of Shaken Baby Syndrome justified the detention of A.L. and his sibling, N.L., who was not at the hospital and had suffered no injuries. The court could not have made this ruling without finding that there was a reasonable basis to conclude that the parents injured A.L., thereby placing both him and N.L. at risk.

Plaintiffs' allegation that multiple social workers and law enforcement officials did not believe the parents caused A.L.'s injuries or otherwise presented any imminent risk to the children raises factual questions as to whether County social workers had a reasonable basis for reaching a different conclusion.

These allegations also raise questions regarding the adequacy of the investigation that County social workers conducted prior to the children's detention. (*Wallis, supra*, 202 F.3d at p. 1138 ["[officials] cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued . . ."].) Based on the facts pleaded in the third amended complaint, plaintiffs may be able to show that County social workers detained A.L. without speaking to Downs or the numerous professionals who concluded that Downs had likely inflicted the injuries on the child. Even if it is shown that County social workers did consult these individuals, plaintiffs might be able to prove facts demonstrating that the social workers arbitrarily discounted the opinions of other professionals or failed to adequately investigate Downs's role in A.L.'s injuries. (See *Jensen, supra*, 145 F.3d at p. 1082 ["dismissal [of section 1983 claim at the pleadings stage] is warranted [only] if it appears beyond doubt that [plaintiff] can prove no set of facts in support of her claims that would entitle her relief"].)

Lack of exigency is also suggested by plaintiffs' allegations regarding the timing of the children's detention. According to the complaint, doctors reported that A.L. was exhibiting symptoms of Shaken Baby Syndrome on the evening of September 17th. The County social workers, however, did not detain A.L. and N.L. until the afternoon of September 19th. Therefore, more than a day and a half passed between the occurrence of the purported exigency that gave rise to the detention (A.L.'s diagnosis of Shaken Baby Syndrome) and the actual detention. During that intervening time, the parents were allegedly provided access to A.L.'s hospital room. N.L., on the other hand, was left at the parents' house, where he remained under their custody without state supervision. Plaintiffs' allegation that County social workers left the children in the parents' custody for approximately 40 hours "raises . . . serious question[s]" about whether they had a reasonable belief that A.L.'s diagnosis placed A.L. and N.L. in "imminent danger." (*Mabe, supra*, 237 F.3d at p. 1108 [fact that official decided to "delay the removal" for a period of four days "raise[d] a serious question [regarding whether official had] reasonable belief that [the child] was in imminent danger"]; see *Rogers, supra*, 487 F.3d at pp. 1294–1296 ["official's prior willingness to leave the children in their home militates against a finding of exigency . . . ."; "[o]ur conclusion that no exigency existed here is also supported by the fact that the Child Protective Services delayed in investigating the case and in removing the children"].)

This alleged 40-hour delay also raises questions as to why officials did not attempt to obtain a warrant prior to taking custody of A.L. and N.L. It may be reasonably inferred from the allegations in the complaint that County social workers did not believe the children were at risk during the 40 hours that passed between A.L.'s diagnosis and the time of the detention. Presumably, this was a sufficient amount of time to seek judicial authorization to take both children into custody. (See *Rogers, supra*, 487 F.3d at p. 1294 [to support warrantless detention, officials must have reasonable cause to believe that the child is "likely to experience serious bodily harm in the time that would be required to obtain a warrant."].)

The juvenile court's findings at A.L. and N.L.'s detention hearing also raise questions as to whether the County social workers had a reasonable basis for believing that the parents presented an imminent risk to their children. The complaint alleges that, five days after detaining the children, DCFS filed a petition seeking jurisdiction over the children under Welfare and Institutions Code section 300. Having reviewed all the evidence offered in support of the petition, the juvenile court found that there was no basis for concluding that the parents were responsible for A.L.'s injuries or that they presented a risk to their children. The court then ordered that DCFS release the children back to the parents. (See *Wallis, supra*, 202 F.3d at pp. 1138–1139 [fact that juvenile court rejected evidence DCFS offered in support of claim that parents presented imminent threat to children was relevant factor in assessing reasonableness of children's warrantless detention].)

Even if "reasonable cause" existed to believe that the parents had in fact caused the injuries to A.L., allegations in the complaint suggest that plaintiffs might be able to prove facts demonstrating that it was unreasonable to believe that either A.L. or N.L. was "likely to experience serious bodily harm in the time that would be required to obtain a warrant." (See *Rogers, supra*, 487 F.3d at p. 1294.) The complaint alleges that, at the time A.L. was detained from his parents, he was still in the hospital and remained "under the eye of [C]ounty social workers." There is no information in the complaint indicating that the parents had threatened or otherwise intended to remove A.L. from the hospital. Accordingly, it is not beyond doubt that plaintiffs may be able to prove facts demonstrating that (1) while in the hospital, the parents did not present any risk to A.L. because they were being monitored by medical personnel and social workers and (2) the County social workers could have obtained a warrant before the child was discharged from the medical facilities. (*Rogers, supra*, 487 F.3d at pp. 1295, 1298 ["There is no indication in the record that [the two-hour delay necessary to obtain a warrant] could have resulted in a significant worsening of the children's physical conditions or an increase in the prospects of long-term harm."].)

The complaint also alleges that, at the time of N.L.'s detention, both parents were at the hospital with A.L. N.L. was left at the parents' home, under the care of mother's sister and brother-in-law, Jessica and Ignacio Gomez, because both parents were at the hospital with A.L. Although the Gomezes presented no apparent risk to N.L. and the three-year-old child had suffered no injury, County social workers allegedly traveled to the home, seized N.L. from the Gomezes and placed him in a foster home. Based on these allegations, plaintiffs may be able to prove that, even if there was reasonable cause to believe that the parents injured A.L., this did not place N.L. at imminent risk of harm because he was not under the parents' control at the time of his detention. Alternatively, plaintiffs may be able to show that County social workers could have obtained a warrant while the parents were at the hospital, during which time N.L. remained in the Gomezes' custody.[13]

The County defendants, however, argue that allegations in the complaint do establish that the social workers had reasonable cause to believe that the parents inflicted A.L.'s injuries. First, they assert that reasonable cause existed because Shaken Baby Syndrome is "a type of injury normally inflicted by the immediate caregivers (i.e., the parents)." Even if we assume the truth of this conclusory statement, which is unaccompanied by any factual or legal citation, defendants overlook plaintiffs' allegation that A.L. began exhibiting signs of trauma while under the care of Downs. Moreover, the complaint alleges that, prior to A.L.'s detention, numerous hospital personnel and the police concluded that Downs, and not the parents, had inflicted the injuries. Given these alleged facts, we cannot say that, as a matter of law, County social workers had a reasonable basis to conclude that the parents were responsible for A.L.'s Shaken Baby Syndrome.

Second, defendants argue that reasonable cause is established by "plaintiffs' allegation that . . . it was unclear how or by whom [the child] had been

---

[13] Federal courts have also made clear that, even if the evidence establishes that exigent circumstances supported the warrantless detention of a child, a plaintiff may prevail on a section 1983 claim if he shows that the actions taken by the officials—in this case, ejecting the parents from A.L.'s hospital room and placing N.L. in a foster home—"exceeded the permissible scope of the action necessary to protect [the children] from that immediate threat." (*Wallis, supra,* 202 F.3d at p. 1138 [where evidence showed only that father presented an imminent risk to children, a material issue of fact existed as to whether officials exceeded permissible scope of intrusion by refusing to leave children in mother's custody]; see *Mabe, supra,* 237 F.3d at p. 1110.) Here, the complaint alleges that County social workers (1) ousted the parents from A.L.'s hospital room despite the fact that, while in the room, they were being monitored by social workers and (2) removed N.L. from the Gomezes and placed him in a foster home without considering any lesser alternatives. Plaintiffs' appellate briefs do not address whether they have adequately pleaded facts showing that the "the scope and degree of [this] state interference was [not] justified by the alleged exigency." (*Wallis, supra,* 202 F.3d at p. 1140.) We therefore decline to address the issue for the purposes of this appeal.

injured." According to defendants, this allegation conclusively demonstrates that "[t]he parents were probable suspects by necessity." Plaintiffs' complaint, however, does not allege that it was unclear how the child had been injured. Rather, it alleges that social workers told the parents they were detaining A.L. because it was unclear how the child had been injured. Plaintiffs' allegation that social workers told the parents the purported reason for the detention does not establish that there was reasonable cause to believe the parents had inflicted A.L.'s injury.

■ The County defendants next contend that, even if there was no reasonable cause to believe the parents inflicted A.L.'s injury, County social workers were permitted to detain the child based solely on the fact that he was diagnosed with Shaken Baby Syndrome. According to the County defendants, "[i]t is established . . . through decisional authority [and] by statute . . . that Shaken Baby Syndrome constitutes 'immediate' danger authorizing the social workers to [detain children without judicial authorization]." The only statutory authority cited in support of this argument is Health and Safety Code section 24520, which declares that Shaken Baby Syndrome is a dangerous, sometimes fatal condition, that is caused by shaking an infant. The statute further declares that "many adults remain unaware of how dangerous this practice can be" and encourages public and private institutions to "improve[] [public] understanding" of this "preventable" form of injury. (See Health & Saf. Code, § 24520, subds. (c)–(f).) Section 24520 merely establishes that Shaken Baby Syndrome is a serious condition that may be prevented by educating the public about dangers associated with shaking an infant; it does not provide officials authorization to automatically detain any child who displays symptoms of Shaken Baby Syndrome.

County defendants also contend that *M.L., supra,* 172 Cal.App.4th 520, which they characterize as a "similar" case, provides "decisional authority" demonstrating that County social workers had "justification to act due to the serious nature and potentially fatal diagnosis of A.L. with 'Shaken Baby Syndrome.' " In *M.L.,* a mother filed a petition for writ of mandate challenging a jurisdictional order finding that her newborn qualified as a dependent child within the meaning of Welfare and Institutions Code section 300. The evidence presented at the jurisdictional hearing showed that the mother had a history of substance abuse and that her six older children were all dependents of the juvenile court. Approximately one month before giving birth, the mother entered into an agreement permitting an adoption agency to select a family for her unborn child. During her pregnancy, the mother rejected the adoption agency's "entreaties to obtain prenatal care" and tested positive for amphetamines. (*M.L., supra,* 172 Cal.App.4th at pp. 523, 524.)

The mother gave birth to the child at approximately 11:00 p.m. Hospital toxicology tests conducted immediately after the birth revealed the presence

of amphetamines in the mother and the newborn. Within an hour of giving birth, the mother signed a revocable release permitting the hospital to give custody of the newborn to the adoption agency and then discharged herself. The adoptive parents arrived at the hospital the next day and spent the afternoon and evening with the newborn. .

That same evening, the mother called the hospital and told them that she had revoked her consent to release the baby to the adoption agency and had selected different adoptive parents. Shortly thereafter, the mother arrived at the hospital appearing " 'flighty, . . . hyper, [and] talking very fast.' " (*M.L., supra*, 172 Cal.App.4th at p. 524.) The mother demanded that the hospital give her the baby. The hospital refused and DCFS took the child into custody. During a subsequent interview, the mother told a DCFS social worker that her positive toxicology report was caused by the consumption of diet pills that she used to treat her depression. At the jurisdictional hearing, the mother could not explain why the toxicology test was positive. The juvenile court sustained the Welfare and Institutions Code section 300 petition.

In her petition for writ of mandate, the mother argued, in part, that DCFS had no basis for detaining her child without prior judicial authorization. The appellate court disagreed, explaining: "Social workers constitutionally may remove a child from the custody of a parent without prior judicial authorization if the information they possess at the time of seizure provides reasonable cause to believe that the child is in imminent danger. [Citations.] . . . [¶] Here the newborn was 24 hours old and had been exposed to drugs during gestation. Mother had received little prenatal care and, one year earlier, had exposed another child to drugs during gestation. She discharged herself from the hospital within an hour after giving birth and could not be reached by telephone or a visit to her home. The following evening, she appeared at the hospital in an agitated and flighty condition, and revoked the [release of the child to the adoption agency.] [The] social worker . . . reasonably concluded that Mother might return to the hospital and remove the newborn against medical advice and thereby endanger her. . . . Thus sufficient evidence supports the juvenile court's finding of exigent circumstances." (*M.L., supra*, 172 Cal.App.4th at p. 527.)

*M.L.* shares little in common with this case. As a preliminary matter, *M.L.* was a dependency case and the court's finding that exigent circumstances supported the child's warrantless detention was based on evidence presented at a contested jurisdictional hearing. By contrast, this case is still in the pleadings stage and plaintiffs have not had an opportunity to develop or present their evidence.

Second, and more importantly, the facts of *M.L.* are entirely distinguishable. The evidence at the jurisdictional hearing showed that mother had

abused amphetamines during her pregnancy and that amphetamines were found in the baby's system at the time of birth. Although mother voluntarily left her newborn at the hospital one hour after giving birth, she arrived the next day and, while exhibiting signs of amphetamine use, demanded the child's return. No similar factual allegations are present here. Indeed, there is not a single allegation in the complaint suggesting that the parents played any role in A.L.'s injury or that they had otherwise engaged in any conduct that placed the child at imminent risk of harm.

Moreover, there is no language in *M.L.* suggesting that an official may detain a child from its parents based solely on the fact that the child exhibited symptoms of a serious injury. The newborn in *M.L.* was detained because it had been exposed to drugs during gestation (a form of injury that was necessarily inflicted by the mother) and because the mother appeared to be under the influence of drugs when she attempted to take custody of the child.[14]

In sum, although we do not dispute that Shaken Baby Syndrome is a serious, life-threatening injury, we disagree with the County defendants' assertion that a child may be detained without prior judicial authorization based solely on the fact that he or she has suffered a serious injury. Rather, the case law demonstrates that the warrantless detention of a child is improper unless there is "specific, articulable evidence" that the child would be placed at imminent risk of serious harm absent an immediate interference with parental custodial rights. (*Wallis, supra,* 202 F.3d at p. 1138; see *Ram v.*

---

[14] The County defendants cite other cases with distinguishable facts. In *Kia P. v. McIntyre* (2d Cir. 2000) 235 F.3d 749, a federal court sustained a summary judgment order finding that the defendant had not violated section 1983 when it temporarily detained a newborn child who tested positive for methadone and exhibited symptoms of methadone withdrawal. At the time she was admitted to the hospital, the mother admitted she had smoked crack in the past. As in *M.L.*, the nature of the injury suffered by the child—exposure to drugs during gestation— demonstrated that there was reasonable cause to believe the parent had engaged in conduct placing the child at imminent risk. Moreover, the plaintiffs' section 1983 claim was based on the decision to detain the child in the hospital, where it was being observed for methadone withdrawal. In this case, plaintiffs have not asserted that their constitutional rights were violated by holding A.L. in the hospital. They assert that their constitutional rights were violated because they were ejected from the hospital while A.L. was receiving care. The County defendants also cite *Duchesne, supra,* 566 F.2d 817, in which an appellate court affirmed a directed verdict entered on a portion of a section 1983 claim arising from the detention of the plaintiffs' child. The plaintiffs' evidence showed that the mother had been admitted to a psychiatric ward and " 'no one [was left] to take care of the children.' " (*Duchesne,* at p. 826.) The appellate court concluded that "the evidence establishe[d] that the taking of the children was justified at the outset by an emergency. As such, as a matter of constitutional law, the initial removal of the children without parental consent or a prior court order was permissible." (*Ibid.,* italics omitted.) The complaint in this case contains no allegation suggesting that the parents abandoned their children or otherwise denied them proper care.

*Rubin* (9th Cir. 1997) 118 F.3d 1306, 1311 (*Rubin*) ["[N]ormally, notice and a hearing are required before the children can be removed, even temporarily, from the custody of their parents. A state official cannot remove children from their parents unless the official has a reasonable belief that the children are in imminent danger."].) It follows that, if a child suffers a serious injury, and there is no reasonable cause to believe that the parents either caused the injury or committed other conduct that places the child at imminent risk of harm (such as failing to seek medical care or abandoning the child), the state may not interfere with parental custody unless it obtains judicial authorization to do so. (See *Rubin, supra*, 118 F.3d at p. 1311 ["serious allegations of abuse which are investigated and corroborated usually gives rise to a reasonable inference of imminent danger sufficient to justify taking children into temporary custody"]; *Duchesne, supra*, 566 F.2d at p. 826 [warrantless detention proper where " 'no one [was left] to take care of the children.' "].)

 In concluding that plaintiffs have adequately stated a section 1983 claim against the County defendants, we emphasize the early stage of the proceedings and the limited scope of our review. As explained above, "[w]hether reasonable cause to believe exigent circumstances existed in a given situation, 'and the related questions, are all questions of fact to be determined by a jury.' [Citation.]" (*Mabe, supra*, 237 F.3d at p. 1108.) Federal courts have explained that claims involving disputed questions of fact are "often inappropriate for resolution" at the pleadings stage. (*Tello v. Dean Witter Reynolds, Inc.* (11th Cir. 2005) 410 F.3d 1275, 1283.) Indeed, dismissal of a section 1983 claim is appropriate only if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of [the] claims that would entitle [him to] relief." (*Jensen, supra*, 145 F.3d at p. 1082.) No such showing has been made here. Although the evidence may ultimately show that County social workers had a reasonable basis for believing that the parents did in fact cause A.L.'s injuries or presented an imminent risk to their child's safety, we cannot make such a determination based solely on the allegations in the complaint.[15]

---

[15] Plaintiffs also argue that they have properly stated a section 1983 claim against the County defendants by alleging that social workers made a series of knowingly false statements and intentionally omitted exculpatory information during the dependency proceedings. (See *Beltran v. Santa Clara County* (9th Cir. 2008) 514 F.3d 906, 908 (*Beltran*) [social workers "are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition"].) Having concluded that plaintiffs adequately stated a section 1983 claim arising out of the County social workers' detention of A.L. and N.L., we need not address this alternative theory of liability. (Cf. *Holmes v. Summer* (2010) 188 Cal.App.4th 1510, 1528 [116 Cal.Rptr.3d 419]; *Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist.* (2003) 113 Cal.App.4th 597, 608 [6 Cal.Rptr.3d 574].)

### 3. *The trial court erred in dismissing plaintiffs'* Monell *claim*

■ After sustaining the County defendants' demurrer to the fifth cause of action for violation of section 1983, the trial court granted the County's motion for judgment on the pleadings on plaintiffs' eighth cause of action, which asserted a *Monell* claim.[16] Under *Monell, supra,* 436 U.S. 658, a local government may not be held liable for its employees' violations of section 1983 unless "the constitutional violation was caused by its official policy, practice, or custom." (*Kerkeles, supra,* 199 Cal.App.4th at pp. 1015–1016.) The trial court granted the County's motion for judgment on the pleadings based on its prior finding that the detention of A.L. and N.L. was not a constitutional violation. Because we have reversed that ruling, we must also reverse the trial court's order granting judgment on the pleadings on plaintiffs' eighth cause of action.

### C. *Penal Code Section 11172 Provides the CHLA's Defendants Immunity to Plaintiffs' State Law Claims Only*

Plaintiffs have appealed four causes of action against CHLA and several of its employees. First, they appeal the trial court's dismissal of their section 1983 claim, which was pleaded against the CHLA and employees Wilson, Himmelrach and Imagawa (CHLA defendants). They also appeal three state law claims against CHLA and Wilson for intentional infliction of emotional distress, invasion of privacy and stalking.

### 1. *The trial court erred in dismissing plaintiffs' section 1983 claim against the CHLA defendants*

Plaintiffs' section 1983 claim alleges that the CHLA defendants "voluntarily collaborated with DCFS and willfully participated in the removal of A.L. from the care and custody of [the parents]." The trial court provided two reasons for sustaining the CHLA defendants' demurrer to this claim. First, it concluded that A.L.'s diagnosis of Shaken Baby Syndrome qualified as an exigent circumstance supporting the detention of the child. Alternatively, the court concluded that the CHLA defendants were immune from suit under Penal Code section 11172.

As discussed above, the trial court erred in concluding that the allegations in the complaint demonstrated that, as a matter of law, A.L.'s detention was

---

[16] "A motion for judgment on the pleadings, like a general demurrer, challenges the sufficiency of the plaintiff's cause of action and raises the legal issue, regardless of the existence of triable issues of fact, of whether the complaint states a cause of action. [Citation.]" (*Brownell v. Los Angeles Unified School Dist.* (1992) 4 Cal.App.4th 787, 793 [5 Cal.Rptr.2d 756].) On appeal, we apply the same standard of review as with a general demurrer. (*Baughman v. State of California* (1995) 38 Cal.App.4th 182, 187 [45 Cal.Rptr.2d 82].)

supported by exigent circumstances. We therefore must consider the court's other ground for dismissal: whether the CHLA defendants were immune from plaintiffs' section 1983 claim under Penal Code section 11172. Plaintiffs assert that section 11172, which is part of the Child Abuse and Neglect Reporting Act (Pen. Code, § 11164 et seq.), may not be asserted as a defense to a federal section 1983 claim. The CHLA defendants, however, argue that we should follow *Thomas v. Chadwick* (1990) 224 Cal.App.3d 813 [274 Cal.Rptr. 128], which specifically held that section 11172 may be asserted as a defense to a section 1983 claim.

a. *Summary of California child abuse reporting requirements and section 11172 immunity*

■ The California Legislature enacted the Child Abuse and Neglect Reporting Act (CANRA) to help rectify the problem of inadequate child abuse reporting. (See Pen. Code, § 11164 et seq.; *Krikorian v. Barry* (1987) 196 Cal.App.3d 1211, 1217 [242 Cal.Rptr. 312] (*Krikorian*).) The Act requires "mandated reporter[s]" to make a report of abuse to one of several designated agencies "whenever the mandated reporter, in his or her professional capacity or within the scope of his or her employment, has knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect." (Pen. Code, § 11166, subd. (a).) Penal Code section 11165.7 lists 40 categories of employees who qualify as "mandated reporters," which include social workers and employees of private organizations whose duties require direct contact and supervision of children. (Pen. Code, § 11165.7, subd. (a)(8), (15).) Failure to comply with these mandated reporter duties is a misdemeanor. (Pen. Code, § 11166, subd. (c).)

"In order to promote the purpose of the act to protect abused children, section 11172 provides that mandated reporters of child abuse are absolutely immune from liability." (*Robbins v. Hamburger Home for Girls* (1995) 32 Cal.App.4th 671, 679 [38 Cal.Rptr.2d 534] (*Robbins*).) Penal Code section 11172, subdivision (a) provides: "[n]o mandated reporter shall be civilly or criminally liable for any report required or authorized by this article, and this immunity shall apply even if the mandated reporter acquired the knowledge or reasonable suspicion of child abuse or neglect outside of his or her professional capacity or outside the scope of his or her employment."

"This absolute immunity extends not only to the making of the initial report, but also to 'conduct giving rise to the obligation to report, such as the collection of data, or the observation, examination, or treatment of the suspected victim' performed in a professional capacity [citation] and to subsequent communications between the reporter and the public authorities

responsible for investigating or prosecuting child abuse. [Citations.]" (*Robbins, supra*, 32 Cal.App.4th at p. 679.) The immunity extends even to negligent, knowingly false, or malicious reports of abuse. (*Storch v. Silverman* (1986) 186 Cal.App.3d 671, 681 [231 Cal.Rptr. 27]; *Krikorian, supra*, 196 Cal.App.3d at p. 1215.)

> b. *Section 11172 may not be asserted as a defense to a section 1983 claim*

The United States Supreme Court has repeatedly held that "a state law that immunizes government conduct otherwise subject to suit under § 1983 is preempted, even where the federal civil rights litigation takes place in state court, because the application of the state immunity law would thwart the congressional remedy . . . ." (*Felder v. Casey* (1988) 487 U.S. 131, 139 [101 L.Ed.2d 123, 108 S.Ct. 2302]; see *Martinez v. California* (1980) 444 U.S. 277, 284, fn. 8 [62 L.Ed.2d 481, 100 S.Ct. 553] ["[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law"].) Under these preemption principles, state statutory immunities for child abuse investigations may not ordinarily be asserted as a defense to a section 1983 claim. (See *Good v. Dauphin County Social Services for Children and Youth* (3d Cir. 1989) 891 F.2d 1087, 1091 [Pennsylvania child protective services law could not be asserted as a defense to a § 1983 claim alleging that defendants committed an unlawful search during a child abuse investigation]; *Wallis, supra*, 202 F.3d at pp. 1143–1144 [district court erred when it "applied state statutory immunities for child abuse investigations to the federal . . . § 1983 action"].)

In *Thomas v. Chadwick, supra*, 224 Cal.App.3d 813, however, appellate District Four concluded that Congress had established an exception to these preemption rules for immunity laws that protect child abuse reporters. The plaintiff in *Chadwick* alleged that state officials had "acted negligently and recklessly in making the . . . report [of child abuse]," thereby "depriving [plaintiffs] of their constitutional right to family unity undisturbed by unwarranted government interference." (*Id.* at p. 818.) The defendants moved for "judgment on the pleadings, arguing (among other things) . . . that [their] acts were protected by absolute immunity under [Penal Code section 11172]." (*Ibid.*) In opposition, the plaintiffs argued that a section 1983 claim "may not be barred by state law immunities." (224 Cal.App.3d at p. 819.)

The appellate court began its analysis by summarizing the preemption principles that govern whether a state immunity law may be used as a defense to a federal civil rights claim: "Ordinarily, state statutory immunities cannot protect a defendant against federal civil rights litigation because of the supremacy clause of the United States Constitution. [Citation.] The preemptive effect of the supremacy clause precludes enforcement of an inconsistent

state law defense to section 1983 liability where Congress has shown no intent to adopt or engraft state law defenses onto federally secured rights. [Citation.] [¶] However, the touchstone of preemption is congressional intent: Does the state law stand as an obstacle to achieving the federal purposes? [Citation.] Thus, state law defenses may be asserted against a section 1983 claim, even though they end up defeating the federal claim, if such defenses are not inconsistent with the intent and purpose of the federal law. [Citation.] In the context of this case we must determine whether the California immunity statute, if applied as a defense to appellants' section 1983 claim, would ' ". . . stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' [Citation.]" (*Thomas v. Chadwick, supra*, 224 Cal.App.3d at p. 823.)

In a well-reasoned analysis, which we quote at length below, the court concluded that provisions in the federal Child Abuse Prevention and Treatment Act (CAPTA), title 42 United States Code section 5101 et seq., which provides federal funding for state programs related to the prevention of child abuse, demonstrated that applying Penal Code section 11172 in the context of section 1983 claims did not frustrate the purposes and objectives of federal law. At the time *Chadwick* was decided, CAPTA included an immunity provision requiring that, to be eligible for a federal grant, each state must have in effect "provisions for immunity from prosecution under State and local laws for persons who report instances of child abuse or neglect for circumstances arising from such reporting." (See 42 U.S.C. § 5106a(b)(1).)

In the court's view, this federal provision impliedly permitted states to provide child abuse reporters full immunity from section 1983 claims: "Congress is empowered to restrict the scope of section 1983 damage actions by creating new immunities to such claims. [Citation.] Congress impliedly authorized the creation of such an immunity by its enactment in 1974 of the C[APTA]. [Citation.] [¶] It is undisputed that" through CAPTA, "Congress called for states to create statutory immunities to bar damage claims against reporters of suspected child abuse. (See 42 U.S.C. § 5106a(b)(1)(B).) The issue is whether, as a matter of statutory construction, it is consistent with Congress's intent to construe the immunity provisions as protecting against *all* damage claims based on the report, regardless of the theory of recovery pled by the injured party. As with all statutory construction, we must seek to ascertain and effectuate the purposes of the legislature, interpreting each statutory provision in a manner consistent with its apparent purpose, in light of the objectives to be achieved and the evils to be remedied. [Citations.]

"Congress intended the federal act to facilitate state programs whose objective is to prevent, identify and treat victims of child abuse. [Citation.]

Toward that goal federal grants to states were authorized, conditioned on the requirement that states have laws providing for reporting incidents of child abuse. One of the problems perceived by Congress was inadequate reporting [citation], growing in part out of the reporter's reluctance to incur potential civil liability from lawsuits based on erroneous reports. To cure this evil, Congress required states to grant reporters immunity from prosecutions arising out of such reports. [Citation.] Thus, Congress clearly intended to authorize immunity for reporters in order to encourage more extensive reporting.

"Because fear of civil liability was the impediment to reporting Congress sought to remove, it would be incongruous to construe the federal act as permitting avoidance of immunity (thus resurrecting the impediment to reporting) merely because the injured party pleads federal rather than state causes of action premised on the same operative conduct. If immunity is not applied to section 1983 claims, we apprehend Congress's intent will be frustrated, because reporters will often be exposed to suits akin to appellants' lawsuit against respondents. We cannot ascribe to Congress an intention to obviate the precise goals of the federal act by exempting a section 1983 claim from the ambit of immunity. To the contrary, we believe the congressional intent behind the immunity provision requires that immunity protect against all damage claims arising from the act of reporting, including claims artfully pled under section 1983.

"This interpretation of the statute effectuates its primary purpose— encouraging more extensive reporting—in light of the evils of inadequate reporting which Congress sought to rectify. This interpretation also accords with the canon of statutory construction that to the extent two statutes appear to conflict, a later enactment which more specifically treats the subject should be construed as superseding the more general provisions of the prior statute covering the same subject. [Citations.] While the federal act does not explicitly declare that reporters' immunities will bar section 1983 claims, section 1983 is a more generalized remedial statute, whereas 42 United States Code section 5106a(b)(1) narrowly and specifically addresses reporters' immunities. ' "It is a well settled principle of construction that specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling." ' [Citation.]

"Thus, while the more general remedy provided by section 1983 might have provided an avenue for damage claims against reporters, we interpret the more specific congressional enactment of 42 United States Code section 5106a(b)(1)(B) as engrafting an immunity defense for reporters upon section 1983 liability." (*Thomas v. Chadwick, supra,* 224 Cal.App.3d at pp. 824–826, fns. omitted.)

Five years after *Chadwick* was decided, however, Congress amended CAPTA's immunity provision by adding a "good faith" clause. Under the new version of 42 United States Code section 5106a, to be eligible for federal funding, states must certify that they have a law or program in effect that includes "provisions for immunity from prosecution under State and local laws for individuals making good faith reports of suspected or known instances of child abuse." (42 U.S.C. § 5106a(b)(2)(A)(iv).)[17]

The Senate report accompanying the 1995 amendments contains the following explanation regarding the amended immunity provision: "Under current law, CAPTA requires, as part of the State eligibility requirements, that mandated reporters receive[] full immunity from prosecution for all reports . . . of suspected child abuse. Almost two-thirds of abuse and neglect reported is not substantiated. There is a disturbing trend of estranged spouses using charges of abuse against the ex-spouse to gain custody of children. [¶] In order to address this problem, the committee gives States authority to prosecute persons who knowingly or maliciously file false abuse charges while protecting those who report in 'good faith' . . . ." (Sen.Rep. No. 104-117, 1st Sess. (1995).)

This change in the law effectively abrogates the holding in *Chadwick*. *Chadwick*'s conclusion that Penal Code section 11172 could be asserted as a defense to 42 United States Code section 1983 claims was directly predicated on the fact that the prior version of CAPTA required states to provide full immunity to child abuse reporters. However, as indicated in the Senate report quoted above, the 1995 amendment withdrew the requirement that "mandated reporters receive[] full immunity from prosecution from all reports" (Sen.Rep. No. 104-117, 1st Sess. (1995)) and replaced it with a requirement mandating only that states provide immunity "for individuals making good faith reports of suspected or known instances of child abuse" (42 U.S.C. § 5106a(b)(2)(B)(vii)). It may be inferred from this amendment that Congress now believes CAPTA's goals may be accomplished by requiring states to immunize only good faith reports of abuse.

Using *Chadwick*'s own rationale, the current version of CAPTA effectively permits section 1983 defendants to utilize state laws that provide immunity for good faith reports of suspected child abuse. (*Thomas v. Chadwick, supra*, 224 Cal.App.3d at p. 826 [42 U.S.C. § 5106a " 'engraft[s] an immunity defense for reporters upon section 1983 liability' "].) Penal Code section 11172, however, goes further, extending absolute immunity that applies even to false and malicious reports of suspected abuse. As explained in *Chadwick*,

---

[17] Since the 1995 amendments, CAPTA has been amended several more times. However, the text of the immunity provision, which now appears at 42 United States Code section 5106a(b)(2)(B)(vii), has not been altered.

"[t]he preemptive effect of the supremacy clause precludes enforcement of an inconsistent state law defense to section 1983 liability [unless] Congress has shown [an] intent to adopt or engraft state law defenses onto federally secured rights." (*Chadwick, supra*, 224 Cal.App.3d at p. 823.) Although the prior version of CAPTA may have demonstrated a congressional intent to "engraft" state law defenses that provide child abuse reporters absolute immunity onto the federal rights secure under section 1983, the current version does not.

The CHLA defendants, however, contend that the 1995 amendment does not affect *Chadwick*'s holding. First, they argue that "[*Chadwick*] remains valid because the edict from Congress still requires California to provide some form of immunity to reporters of child abuse. It would be inconsistent for Congress to both compel immunity statutes and then invalidate their existence or applicability." We see no inconsistency in requiring states to provide immunity to individuals who, in good faith, report suspected child abuse, while simultaneously precluding states from immunizing government officials from section 1983 liability when they intentionally falsify such reports in violation of the United States Constitution. (See *Beltran, supra*, 514 F.3d at p. 908 [social workers "are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition"].)

The CHLA defendants also argue that the legislative history of the 1995 CAPTA amendment "establishes that Congress's intent ha[d] little to do with 'mandated reporters' . . . . Rather, Congress intended to amend the statute related [*sic*] because of estranged spouses who use charges of child abuse to obtain custody advantages. But California's absolute mandatory reporter immunity provides no immunity to the report of child abuse by estranged spouses and, thus, was unaffected by the amendment." This argument is without merit.

First, we do not agree that the legislative history indicates that Congress amended CAPTA's immunity provision solely to address the problem of "estranged spouses" using false allegations of abuse to gain custody of children. While it is true that the Senate report accompanying the 1995 amendment specifically referenced this problem, the report also noted that "[a]lmost two-thirds of abuse and neglect reported is not substantiated." (Sen.Rep. No. 104-117, 1st Sess. (1995).) This statement suggests that although Congress was concerned with the conduct of estranged spouses, it also had a more general concern that conferring absolute immunity was resulting in a disproportionately high number of unsubstantiated reports of abuse.

Second, regardless of the reasons for Congress's amendment to CAPTA's immunity provision, the language of the statute makes clear that federal law now requires only that states provide immunity to those who make good faith reports of abuse. This change in the law abrogates the reasoning in *Chadwick*.

Finally, although plaintiffs are correct that the 1995 CAPTA amendments do not alter the fact that estranged spouses do not qualify as mandated reporters for the purposes of Penal Code section 11172, we fail to see the relevance of this argument. The relevant issue is whether section 11172 can still be construed as consistent with federal law given that CAPTA no longer requires states to provide "full immunity" to reporters of abuse. We conclude that it cannot.

c. *The CHLA defendants' remaining arguments regarding plaintiffs' section 1983 claim are without merit*

The CHLA defendants argue that, even if Penal Code section 11172 does not apply in the context of section 1983 claims, there are three independent grounds that support the trial court's decision to sustain the demurrer. First, they contend that plaintiffs' allegations demonstrate that, as a matter of law, they are entitled to qualified immunity because A.L.'s diagnosis of Shaken Baby Syndrome constituted an "exigent circumstance" supporting the child's detention. Although presented as a qualified immunity argument, the CHLA defendants are merely reasserting that the allegations in the complaint demonstrate that the detention of A.L. was not a constitutional violation. We have already addressed that argument and rejected it.

Second, the CHLA defendants argue that we should sustain the trial court's demurrer because "plaintiffs have not sufficiently pled facts to support the claim that the CHLA Defendants acted under color of state law." However, the CHLA defendants' appellate brief specifically admits that, in the trial court proceedings, they "did not demurrer [*sic*] on the basis of the 'color of state law' elements." Nor does it appear that the trial court addressed this issue. Because the CHLA defendants concede they did not raise the "color of state law" element in their demurrer to the third amended complaint, we decline to address the issue in this appeal. (See *City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, 205 [129 Cal.Rptr.3d 433] ["we need not decide whether the complaint fails to allege facts sufficient to state a cause of action for reasons that were not raised in the demurrer"].)

Third, the CHLA defendants argue that although the complaint alleges that they "jointly and willfully participated" in the unlawful detention of A.L., plaintiffs "fail to allege sufficient facts to establish that [the CHLA defendants] personally participated in the violations of the constitution." According

to the CHLA defendants, the only conduct alleged against them in the complaint involved a " 'series of phone calls' " that Elizabeth Wilson (a CHLA social worker) made to the parents after A.L. and N.L. were returned to their custody. The CHLA defendants further contend that because this conduct occurred after A.L. was released to his parents, it cannot serve as the basis for a section 1983 claim that is predicated on A.L.'s detention.

The CHLA defendants overlook additional allegations in the complaint describing their purported role in A.L.'s detention. In paragraph 31, which is specifically incorporated into the section 1983 claim, plaintiffs allege that: "[D]ue to a personality conflict with [the father], [CHLA defendants] . . . engaged in a malicious effort to convince police officers that they were looking at the wrong suspect. This effort to 'sell' [father] as a key suspect was undertaken by these defendants . . . in retaliation for [father's] questioning their authority. This retaliatory conduct . . . was part of a vendetta against [father]. It was part of the effort to teach [father] a lesson, i.e., that these defendants were in charge and he better just do what they say without question." During oral argument, plaintiffs' counsel emphasized these allegations, arguing that plaintiffs had asserted that Wilson and other CHLA employees maliciously "lobb[ied]" DCFS to investigate the parents and "allow a hospital hold" on A.L. as a way to punish the father.

Liberally construed, these allegations assert that the CHLA defendants caused A.L. to be detained by engaging in malicious acts that were intended to persuade County social workers that the parents had abused him. Plaintiffs' allegations also imply that the CHLA defendants did not engage in this conduct because they believed that the parents were actually at fault, but rather because they wanted to punish the father for questioning their authority.

The CHLA defendants have offered no argument explaining why these facts are insufficient to state a section 1983 claim against them. As a result, we decline to address the issue. (See *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 [87 Cal.Rptr.2d 754] ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties."].)

> 2. *The trial court did not err in dismissing the state law claims against the CHLA and Wilson pursuant to section 11172*

The trial court also concluded that Penal Code section 11172 immunized CHLA and Wilson from plaintiffs' state law claims for intentional infliction of emotional distress, invasion of privacy and stalking.

All three state law claims are predicated on phone calls that Wilson allegedly made to the parents regarding a bruise on A.L.'s ankle. The

complaint alleges that on October 6, 2010, mother took A.L. to the pediatrician, who noticed a bruise on A.L.'s ankle.[18] The next day, Wilson called mother and told her she needed to bring A.L. to an emergency room because "they needed to check [his] foot because it is probably broken." When Father called Wilson back, she told him that mother had contacted CHLA and reported A.L.'s foot might be broken. Wilson then "chang[ed] [her] story," stating that A.L.'s pediatrician had contacted CHLA to report that he believed the parents had caused the bruise. When father questioned Wilson about her inconsistent statements, Wilson "began to laugh at and antagonize the Plaintiffs, and made the threat that [parents'] children would again be taken away." Father ended the call, but Wilson immediately called back and reported that a nurse and a social worker were headed to the parents' home to examine A.L. Two DCFS officials arrived at the home and, after examining A.L., they told the parents to have him examined at a hospital.

### a. Summary of case law analyzing the breadth of conduct immunized under section 11172

Plaintiffs properly do not dispute that Wilson, a social worker at a children's hospital, qualifies as a "mandated reporter." (See Pen. Code, § 11165.7, subd. (a)(15), (8) ["mandated reporter" includes "social worker[s]" and "employee[s] of[] private organization[s] whose duties require direct contact and supervision of children"].) They argue, however, that Wilson's conduct did not involve the act of reporting child abuse within the meaning of Penal Code section 11172 and therefore was not protected under the statute.

Cases analyzing Penal Code section 11172 have concluded that the statute provides immunity for claims predicated on false and malicious reports of abuse as well as conduct committed in furtherance of diagnosing whether abuse occurred. For example, in *Krikorian, supra*, 196 Cal.App.3d 1211, a group of students filed an action alleging that they had been molested by the owner and operator of their preschool. The owner filed a countercomplaint against a psychologist who had been hired by the students' parents to determine whether the children had been sexually abused. The owner alleged that, during his examination of the children, the psychologist had committed various acts and omissions that caused the suspected victims to make false accusations of abuse. The owner also alleged that the psychologist had

---

[18] A portion of this factual summary is based on allegations that appear in the second amended complaint, but not the third amended complaint. " ' "Generally, after an amended pleading has been filed, courts will disregard the original pleading. [Citation.]" ' " (*Berman, supra*, 56 Cal.App.4th at p. 945.) Here, however, plaintiffs and CHLA both refer to the second and third amended complaints in their analysis of these state law claims. We treat this as a mutual concession that, in evaluating the claims, we may rely on the facts pleaded in both complaints.

conspired with others to fabricate allegations of sexual abuse, which was maliciously intended to cause him mental anguish and distress. The psychologist demurred to the claims, arguing that he was immune from suit under Penal Code section 11172. The trial court agreed and sustained the demurrer without leave to amend.

On appeal, the owner argued that Penal Code section 11172 did not apply to his claims because (1) the statute did not immunize "false and malicious" reports of child abuse (*Krikorian, supra*, 196 Cal.App.3d at p. 1215) and (2) the "immunity conferred by [the statute] [wa]s limited to liability for damages caused by the act of reporting," and therefore did not apply to negligent acts the psychologist had committed in evaluating whether the children had been abused (*id.* at p. 1222, italics omitted).

In regard to the first argument, the appellate court explained that prior cases had "soundly rejected" the contention that Penal Code section 11172 only applied to good faith reports of abuse. (*Krikorian, supra*, 196 Cal.App.3d at p. 1215.) According to the court, these prior decisions had consistently interpreted the statute as extending immunity even "for malicious or false reports of child abuse." (*Ibid.*, citing *Storch, supra*, 186 Cal.App.3d 671; see *McMartin v. Children's Institute International* (1989) 212 Cal.App.3d 1393, 1400 [261 Cal.Rptr. 437] (*McMartin*) ["even if an individual designated as a mandated reporter . . . submits a false report with the intent to vex, annoy or harass an innocent party, civil or criminal liability cannot be imposed"].)

The court also rejected the owner's contention that Penal Code section 11172 only applied to the "act of reporting" child abuse, concluding that the statute also provided "mandatory reporters complete[] immun[ity] from liability for professional services rendered in connection with the identification or diagnosis of suspected cases of child abuse." (*Krikorian, supra*, 196 Cal.App.3d at p. 1222.) The court explained that extending immunity to acts taken to identify or diagnose suspected child abuse was consistent with the purpose of the statute: "[L]imiting immunity to the protection of professionals against lawsuits resulting from the act of reporting would defeat the Legislature's goal of promoting increased reporting of child abuse. The Legislature has identified the fear of civil liability for allegedly false reports as a major deterrent to the reporting of suspected cases of child abuse by professionals. . . . A law conferring 'absolute' immunity for the act of reporting suspected child abuse, but *not* for professional activities contributing to its identification, would not likely allay the fear of a prospective reporter that an angry parent might initiate litigation for damages, following a report which is subsequently proven to be mistaken.

"Reporting is expressly required of a designated professional 'who has knowledge of or observes a child *in his or her professional capacity or within*

*the scope of his or her employment* whom he or she knows or reasonably suspects has been the victim of child abuse . . . .' (Pen. Code, § 11166, subd. (a), italics added.) The Legislature's use of the highlighted language clearly contemplates that, in most cases, mandatory child abuse reporting will be preceded by the rendering of professional services by the party making the report. It strains credulity to suggest that the Legislature intended that immunity be granted for the act of reporting but not for the rendering of professional services resulting in the identification of a suspected case of child abuse.

"In enacting the Child Abuse Reporting Act, the Legislature considered the possibility that professional fear of civil liability for the *failure* to report might result in misleading or incorrect reports, but determined that the protection given to children would outweigh any inconvenience or harm to innocent parties caused by a child abuse investigation. [Citation.] Insofar as liability for damages to a person falsely accused of child abuse is concerned, we conclude that section 11172 was intended to provide absolute immunity to professionals for conduct giving rise to the obligation to report, such as the collection of data, or the observation, examination, or treatment of the suspected victim or perpetrator of child abuse, performed in a professional capacity or within the scope of employment, as well as for the act of reporting." (*Krikorian, supra*, 196 Cal.App.3d at pp. 1222–1223, italics omitted.)

In *McMartin, supra*, 212 Cal.App.3d 1393, Division Five of this appellate district followed *Krikorian* in concluding that Penal Code section 11172 provided immunity to defendants who had been retained by the City of Manhattan Beach to determine whether preschool students had been abused and "'who the perpetrators were.'" (212 Cal.App.3d at p. 1398.) The plaintiffs argued that section 11172 did not apply to their claims because they had alleged that the defendants used "unorthodox methods in interviewing the children," which caused them to falsely identify plaintiffs as the probable perpetrators. (212 Cal.App.3d at p. 1401.) The court rejected the argument, explaining that "the manner in which the alleged child abuse [wa]s discovered is irrelevant . . . ." (*Ibid.*) Rather, the relevant inquiry was whether the complaint sought to impose liability for "'conduct giving rise to the obligation to report, such as the . . . observation, examination, or treatment of the suspected victim or perpetrator of child abuse.'" (*Ibid.*)

In *James W. v. Superior Court* (1993) 17 Cal.App.4th 246 [21 Cal.Rptr.2d 169] (*James W.*), the court differentiated *Krikorian* and *McMartin* in concluding that Penal Code section 11172 did not apply to claims alleging that a foster care owner and family counselor had pressured a child to identify her father as the perpetrator of sexual abuse. The complaint alleged that the child

initially reported a man had come through her bedroom window and hurt her. After hospital staff determined she had been raped, the department of social services (DSS) filed a dependency petition and the child was placed in temporary foster care. During the dependency proceedings, DSS referred the parents to a private family counselor.

The complaint alleged that, over the next two years, the child's foster parents and the family counselor treating the parents and the child engaged in a "campaign to convict the father and have [the child] adopted." (*James W., supra*, 17 Cal.App.4th at p. 249.) The defendants were alleged to have pressured the child and other family members to falsely accuse the father, while simultaneously concealing evidence demonstrating that a third party had committed the acts.

The court ruled that Penal Code section 11172 was inapplicable because the defendants' alleged misconduct was not undertaken to identify whether child abuse had occurred, but rather to identify the perpetrator of the abuse. The court explained that, under California law, a "dichotomy" existed between individuals who are required to report instances of suspected abuse and officials who are responsible for investigating and prosecuting allegations of abuse. (*James W., supra*, 17 Cal.App.4th at p. 257.) Under the relevant statutory framework, section 11172 was intended to protect individuals required to report instances of suspected abuse while other statutes protect government officials who, having received a report of abuse, are responsible for identifying and prosecuting the perpetrator of abuse.

The court concluded that, under this statutory framework, the defendants' conduct fell outside the protection of Penal Code section 11172 because they had "[come] onto the scene after the . . . child abuse had been positively identified and reported [and then] voluntarily assumed roles of those who, having received the report and determined the identity of the perpetrator, search for corroboration and/or attempt to pressure a witness to get a conviction. Because [defendants] were not acting as reporters they . . . may not take advantage of the reporting act immunity." (*James W., supra*, 17 Cal.App.4th at p. 256.)

The court also specifically differentiated *Krikorian* and *McMartin*, explaining that, in both of those cases, the plaintiffs asserted claims against experts who were retained to evaluate whether any child abuse had occurred. The court ruled that, in contrast, the plaintiffs' claims against the foster parent defendants demonstrated that they were not "treating a suspected victim preliminary to a determination of child abuse and were not professionally qualified to do so." (*James W., supra*, 17 Cal.App.4th at p. 257.) The claims against the family counselor defendant, on the other hand, demonstrated that

the counselor had not been hired to evaluate whether the child was abused, but rather had been appointed by DSS to serve as the plaintiffs' "treating therapist" after the initiation of dependency proceedings. (*Id.* at p. 258, italics omitted.) In summarizing its holding, the court explained that "the differences between *Krikorian, McMartin* and this case outweigh any arguable similarities. Whatever justifications exist for extending the immunity of the reporting act to forensic teams investigating whether a child has actually been abused, they are clearly not present here." (*Ibid.*)

b. *The conduct alleged against Wilson falls within section 11172*

Plaintiffs contend that the trial court erred in ruling that Penal Code section 11172 applied to their state law claims because "Wilson's harassing, antagonizing, and threatening conduct, served no professional purpose under California's statutory reporting scheme." While recognizing that this is a close case, we affirm the trial court's ruling that section 11172 applies under the circumstances presented here.

Plaintiffs' state law claims allege that Wilson told the parents that, based on information received from A.L.'s pediatrician, she was concerned that the child's foot was broken and requested that they bring him to the CHLA for an examination. After the parents declined to do so, Wilson later called the parents back to inform them that authorities were traveling to their house to examine the child. DCFS arrived shortly thereafter and conducted an examination. We believe that Wilson's communications with the parents qualify as conduct "rendered in connection with the identification or diagnosis of suspected . . . child abuse." (*Krikorian, supra,* 196 Cal.App.3d at p. 1222.) Having received information that A.L. had suffered a bruise on his ankle, Wilson contacted the parents in an attempt to solicit more information about the injury and, when they refused to cooperate, she passed the information along to the investigative agency.

Plaintiffs, however, assert that the conduct was not protected under Penal Code section 11172 because (1) it was conducted in a harassing and threatening manner and (2) it may be inferred from the complaint that neither Wilson nor DeSilva actually believed that the parents had injured A.L.'s foot. The case law is clear, however, that conduct that falls within section 11172 is protected regardless of whether it is committed "with the intent to vex, annoy or harass an innocent party . . . ." (*McMartin, supra,* 212 Cal.App.3d 1393, 1400.) The plaintiff in *Krikorian,* for example, argued the defendant was not entitled to immunity because the manner in which he evaluated the child abuse victims was alleged to be part of a scheme intended to cause the defendant mental anguish and emotional distress. (*Krikorian, supra,* 196

Cal.App.3d at p. 1214.) The court, however, concluded that because the defendant's evaluation was a form of protected reporting activity, the defendant was fully immunized from any claims arising from that conduct. The same is true here; regardless of whether Wilson's inquiries regarding A.L.'s injured foot were intended to harass the parents, they qualify as a form of reporting activity and are therefore protected under section 11172.

Plaintiffs also argue that this is controlled by *James W.*, rather than *Krikorian* and *McMartin*, because Wilson effectively engaged in investigative, rather than reporting activities. There are, however, several notable differences between Wilson's alleged misconduct and the conduct at issue in *James W.* First, at the time Wilson called the parents to inquire about A.L.'s ankle, there was no preexisting report of abuse regarding that injury. In contrast, the defendants' conduct in *James W.* occurred after DCFS had substantiated the report of abuse and removed the child from the home. Second, the allegations in the complaint do not demonstrate that Wilson attempted to "usurp[] the function[] of the department of children's services." (See *Robbins, supra*, 32 Cal.App.4th at p. 680 ["the instant case is distinguishable from *James W.* because here defendants . . . [did not] . . . usurp[] the function[] of the department of children's services"].) Instead, the complaint alleges that, after the parents declined Wilson's request to bring the child in for an examination, she contacted DCFS, who then traveled to the home to conduct an examination. Third, Wilson's conduct, which consisted of two phone calls, was of brief duration. (See *id.* ["the instant case is distinguishable from *James W.* because here defendants['] . . . conduct lasted only a few days"]; *Stecks v. Young* (1995) 38 Cal.App.4th 365, 373, fn. 7 [45 Cal.Rptr.2d 475] [". . . *James W.* . . . found only that section 11172 '. . . does not apply to activities that continue more than two years after the initial report of abuse by parties who are not acting as reporters.' "].)

This opinion should not be construed as providing mandated reporters broad immunity for investigative conduct that is committed prior to making a report of abuse. We do believe, however, that Penal Code section 11172 applies under the specific circumstances presented here.[19]

---

[19] Plaintiffs have requested that, in the event Penal Code section 11172 is deemed to apply to their state law claims, they should be granted leave to amend their third amended complaint. However, plaintiffs have not described how they would amend the claims. When reviewing a demurrer that has been sustained without leave to amend, "[t]he plaintiff has the burden of proving that an amendment would cure the defect. [Citation.]" (*Schifando v. City of Los Angeles, supra*, 31 Cal.4th 1074, 1081.) Because plaintiffs have not offered any proposed amendment, they have not carried their burden.

## DISPOSITION

The trial court's judgment is reversed. On remand, plaintiffs may pursue their fifth and eighth causes of action for violations of section 1983. Appellants shall recover their costs on appeal.

Perluss, P. J., and Woods, J., concurred.