Filed 10/10/13  In re A.S. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A. S. IV, a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY/FAMILY AND CHILDREN'S SERVICE DIVISION,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>A. S. III,<br><br>        Defendant and Appellant. | A137358<br><br>(San Francisco County<br>Super. Ct. No. JD12-3234) |

**INTRODUCTION**

A. S. III (Father) appeals from the order of the juvenile court adjudging his son, then two years old, a dependent child as described in Welfare and Institutions Code section 300, subdivision (b). and placing the child out of Father's custody.[1]  Father challenges the order on the grounds that (1) the child welfare worker representing the San Francisco Human Services Agency (Agency) failed to obtain a warrant to remove the

_____

[1] All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

child from his custody; (2) the evidence was insufficient to support the court's finding of jurisdiction under section 300, subdivision (b); and (3) the evidence was insufficient to support the detention order removing the child from Father's custody. We shall affirm the challenged orders.

## FACTS AND PROCEDURAL BACKGROUND

*Detention*

On August 22, 2012, Protective Services Worker Barbara Higgins went to the San Francisco home where the child had reportedly been taken by Father. Higgins was investigating a report she had received from the child's paternal grandfather, who was concerned about the child's safety. Father and the child had been living for a year or more in grandfather's home in Roseville. According to the grandparents, around March 2012, they and Father's sister noticed that Father began to exhibit behavior they recognized from a time when he was using methamphetamines and abusing alcohol. He slept in late and was often angry and impatient. When the child would wake up before Father, Father would get angry and yell at the toddler, shouting, "shut the fuck up and go back to sleep." On August 8, grandfather had returned to the home to find Father sleeping on the couch, while the toddler was left to roam the house unsupervised. Father became very angry with grandfather in the presence of the child and began yelling at the grandfather—nose to nose—shouting, "you don't tell me how to raise my kid, just shut the fuck up and stay out of my business." The arguing continued and escalated to the point of posturing of physical threats by Father toward the grandfather. The child was present and frightened during the entire episode.

Father, whom grandfather believed was actively using methamphetamine again, then left grandfather's home and took the child to reside in a home owned by a childhood friend, a known drug dealer. Grandfather was concerned that a pit bull in that home had previously attacked the owner and that the child was used to playing with the gentle pit bull owned by grandfather—not the dangerous dog in the household where Father had taken him to live. Grandfather also believed the owner was renting the home to drug dealers and that the owner may have had guns in the home.

Further, it was reported that Father had lost his job, his unemployment benefits had run out, and he had no money to provide for the child. (The child's mother was reportedly living on the streets in San Joaquin County and could not be contacted at that time. She had lost two other children who were staying with their own fathers in that county.)

Higgins knew that the owner of the residence had 16 felonies for guns and drugs and that drug activity may have been current. She also knew that Father had a previous criminal history for driving under the influence and for sexual assaults within the last 10 years, and that he had a history dating back 15 years regarding methamphetamine use. She had been given this information by the grandfather and had contacted juvenile inspectors who substantiated Father's criminal history. Higgins believed there were exigent circumstances to enter the home based upon her concern that the child might be in imminent danger due to being placed in a dangerous environment where there were dangerous dogs and possibly guns and drugs.

When the juvenile inspector and the sergeant whom Higgins asked to accompany her to check on the child's welfare learned the name of the owner of the property, they determined it was important for them to bring along six police officers with rifles, given the dangerous criminal history of the owner of the home. Higgins and the officers walked up to the house, which had a 10-foot high fence surrounding it. Through spaces in the fence, they saw a four- or five-year-old boy (not the child) and a man, who was later determined to be Father, in the yard. One of the inspectors asked if Father was home and Father said, "No, he's not" and walked inside the home. The juvenile inspector asked the little boy if he could let them in, and the boy opened the gate for them. When they entered the house, they saw Father and the child, who was hovering near him. The owner's wife was present, as was the little boy's mother, who was renting a room in the house. The owner was not present.

In a quick safety-sweep of the home, the officers found no drugs or guns—the owner's wife refused to open a safe in the basement. However, there were two dangerous dogs on the premises: a pit bull owned by the tenant was found in a bedroom around the

3

corner from where the child was and a Presa Canario was found in the backyard. Higgins stated the dogs were not restrained sufficiently and the child had ready access to both dogs. She knew that the Presa Canario breed had a reputation of being a very dangerous dog and that the owner had a history of dog fighting in his back yard. The juvenile inspector and the sergeant observed the owner of the pit bull to be "very high on something." The woman told Higgins that the dog had attacked the property owner when he inappropriately approached the dog, so it was his fault "that her dog did what it did." The officers stated they were confident the owner of the pit bull had "drugs aboard" and would not be able to protect anyone from her pit bull, should the dog feel provoked. Higgins also saw dog feces ("5 or 6 dog poops") on a "pet pad" on the floor, within access of the child. Otherwise, the home was clean and well organized and the child was not dirty or unkempt.

Higgins believed the child was in immediate danger because the house was inhabited by a person who had been convicted of numerous felonies for drugs and guns; there were two potentially very dangerous dogs to which the two-year-old child had ready access; there was a distinct possibility that Father was again using methamphetamine; and dog feces accessible to the child presented a significant hygiene issue. Higgins thought it possible that Father was under the influence of drugs at the time "because his presentation accelerated quickly. He was oppositional and edgy in presentation. There was a possibility that some of that could be attributable to methamphetamine or uppers, which can present that way." Higgins removed the child and placed him with the child's paternal grandparents. Higgins did not recall whether Father asked if the child could be kept in his care at a different location. She did recall Father asked "as his first suggestion" whether the child could be placed with the child's mother. Higgins told Father she questioned his judgment in this, given that the mother, reportedly homeless and using drugs, had stated she wanted to be "buried alive with [her] children." Father acknowledged to Higgins that he knew of that statement by mother and he ultimately agreed that if the child were removed, the paternal grandparents would be the best choice to care for him.

4

The child was detained and placed with the paternal grandparents.

*Jurisdiction and Disposition*

In addition to the foregoing, the report prepared for the jurisdiction and disposition hearings held November 5, 2012, contained a copy of Father's RAP sheet, indicating previous felony convictions for possession of a controlled substance and receiving stolen property, misdemeanor convictions for possession of a controlled substance and reckless driving, assault with a deadly weapon (not a gun) plus numerous other arrests. These all occurred between 2000 and 2006. Father had served time in prison and was not on parole or probation at the time of the child's removal.

At the November 5, 2012 jurisdiction and disposition hearings, the grandfather testified that he had contacted Child Protective Services on August 21, because of his concern that Father had taken the child to a house where Father had grown up, where there was a history of drugs, drug dealing, gun dealing, and dog fighting. The grandfather knew the owner of the house had been "busted" and "put away for a while." He was concerned that the owner was renting rooms to people grandfather believed were involved in drug activity. The grandfather's main concern was that someone staying in the house had a pit bull there who was a volatile, aggressive animal who had attacked the owner. He was afraid that if the toddler, who was used to nuzzling the grandfather's pit bull, met with the unfamiliar pit bull, the dog might "take his face off."

Father testified that he was living in Sacramento, but could not be sure of the address, having recently moved there. Father denied any problem with anger management. However, the child's mother, who had been located, described to the social worker a history of abuse by Father. She reported to Higgins that, in 2010, she obtained a restraining order against Father in San Joaquin County that she maintained was currently in effect, protecting her, her other two children and their school against Father. She did not supply a copy of the order to the social worker and the social worker did not obtain one. Higgins testified that she thought the restraining order information was given to her by the grandfather and she believed it was also confirmed by Father.

5

Social worker Eva Wexler testified that during the assessment period between detention and the jurisdiction and disposition hearings, Father received supervised visits with transportation of the child to and from Roseville provided by the grandparents. Father had four visits, but missed eight of 12 visits, including the last three visits before the jurisdiction and detention hearings. Wexler testified that at the visit scheduled on October 23, the grandfather drove the child to San Francisco from Roseville. Father did not show up and the child was "at the visit walking around from room to room looking for his father, in every single room saying da-da, da-da in each room. [¶] There was a knock at the door and [the child] thought it was his dad, and it was a maintenance worker. And it was really traumatic and distressing for him." The worker let Father know that if he missed the next visit, the visits could be cancelled. Visits were subsequently cancelled due to Father's continued failure to attend them. The four visits Father did attend went very well, with Father actively engaging the child, soothing the child when he became distressed, and generally parenting the child well. Father stated that he was not visiting because he did not like the visits supervised and he did not trust the Agency. Father initially agreed to meet with the social worker, but failed to follow through, rescheduling in-person meetings with the social worker and failing to show up or make contact with her when he missed the third rescheduled meeting. He refused to participate in substance abuse assessment or in anger management assessment. Nor did Father participate in six of eight drug tests requested by the Agency. He tested negative on the first test and positive for THC (an ingredient in marijuana) on the second. He refused to test thereafter.

Father maintained that he had done nothing wrong; that he was no longer on parole or probation and had "earned" his freedom and "the right to say 'no'." He did not believe he should have to comply with the Agency's requests in order to have his son returned. He also stated he could not enjoy his time with his son if visits were supervised. When told that his son was very upset when he did not show up to a visit, Father replied, "I don't think anything could break me and my son's bond. Not a visit. Nothing." Asked about the child's disappointment, Father stated: "You know, I did

6

think about that a couple times, but I feel it's the same thing as if when they cancel on me at the very last minute. [¶] Really, I felt like we didn't need supervised visits, so I felt as through they should have been working harder for getting away from that if I did not need it."

At the end of the jurisdiction hearing the court found that taken as a whole, and after weighing the credibility of the witnesses, there was "more than sufficient evidence to sustain the allegations set forth as a failure to protect under [s]ection 300 (b)."[2] At disposition, the court placed the child with his paternal grandparents, with whom the

---

[2] In declaring the child as a dependent child under section 300, subdivision (b), the court found the following true as to Father:

"The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure or inability of his or her parent . . . to supervise or protect the child adequately[,] by the willful or negligent failure of the parent . . . to provide the child with shelter[.]"

"B-1   The alleged father's behavior has become indicative of resumed substance abuse.  On or about 08/17/2012 the alleged father engaged in an angry and threatening verbal altercation with the [grandfather], which took place in front of the child.

"B-2   The alleged father has an untreated substance abuse problem which impacts his ability to safely parent the child.

"B-3   The alleged father has a substance abuse history which includes methamphetamine and alcohol.

"B-4   The alleged father has an untreated anger management problem which is impacting his ability to safely parent the child.

"B-5   The alleged father took the child on or about 08/17/2012, leaving the home of relatives and moved into the home of a known felon and drug dealer.

"B-6   On 08/22/2012 at the [specified] address, the alleged father and the child were present, as well as two large dogs, a pit bull and a Canario Presario [*sic*] which the child has ready access to.

"B-7   On 08/22/2012 piles of dog feces were observed on the floor of the residence where the alleged father and the child were residing.

"B-8   The alleged father has a criminal history dating back to 1999 which includes DV, sexual battery w/oral copulation w/force, forging checks, using a stun gun, possession of a controlled substance, burglary tools, obstructing a police officer, receiving stolen property and reckless driving.

"B-9   The alleged father is the subject of a current restraining order."

Findings sustained as to the mother are omitted here.

child had been residing since his initial removal. Reunification services were granted to the parents and the matter was set for a six-month review.[3]

## DISCUSSION

## I. Warrantless Detention

Father first argues that his constitutional rights were violated and the removal was improper because the social worker failed to obtain a warrant to remove the child. He argues that because the investigation did not show the child was in immediate danger— no drugs or guns were found in the quick survey done by the officers—the social worker was obligated to obtain a warrant before removing him from Father's custody. Father also contends the worker gave him no opportunity to remove the child to a safer location, as Father requested. We disagree.

Under the Fourth and Fourteenth Amendments, government officials are prohibited from removing children from their parents' custody without a warrant or other judicial preauthorization unless the official has " 'reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant.' " (*Arce v. Children's Hospital of Los Angeles* (2012) 211 Cal.App.4th 1455, 1473-1474 (*Arce*), quoting *Rogers v. County of San Joaquin* (9th Cir. 2007) 487 F.3d 1288, 1294 (*Rogers*); see also *Mabe v. San Bernardino County, Dept. of Public Social Services* (9th Cir. 2001) 237 F.3d 1101, 1106 (*Mabe*).)

First, we observe that the cases relied upon by Father, *Arce, Rogers* and *Mabe,* all involve civil actions for damages under 42 U.S.C. section 1983, brought by parents against authorities *after* juvenile dependency proceedings had concluded. (*Arce, supra,* 211 Cal.App.4th at p. 1460; *Rogers, supra,* 487 F.3d at p. 1290; *Mabe, supra,* 237 F.3d at p. 1104.) No case cited by Father or found by us overturns a court's taking of jurisdiction in dependency proceedings for the failure of the Agency to obtain a warrant, where the taking of jurisdiction was otherwise appropriate and supported by substantial evidence.

---

[3]The Agency advises that the matter was transferred to Sacramento County on December 18, 2012, that Father continues to receive reunification services, and that the matter is currently scheduled for a 12-month review on November 5, 2013.

8

Here, assuming Father were successful in showing that the social worker had no reasonable basis for removing the child without obtaining a warrant, such finding might give rise to a  civil action by Father against authorities.  However such finding would not imply the invalidity of the underlying dependency court jurisdiction and disposition orders that look to the future.  "The previous findings and orders made at the detention hearing . . . are generally made moot by the jurisdiction and disposition determinations and thus cannot be considered on appeal.  [Citation.]"  (Seiser & Kumli, On California Juvenile Courts Practice and Procedure (LexisNexis 2013 ed.) § 2.190[1], p. 2-584, citing *In re Raymond G.* (1991) 230 Cal.App.3d 964, 967.)  The standards for removal of a child by a police officer without a warrant and without judicial authorization are different from the standards governing the court's determination at the detention hearing or any other later dependency proceeding.  "If a minor has been taken into custody under this article and not released to a parent or guardian, the juvenile court shall hold a [detention] hearing . . . to determine whether the minor shall be further detained."  (§ 315; see also § 319, subd. (b).)[4]

In any event, in this case, exigent circumstances supported the worker's removal of the child without a warrant.  "Social workers constitutionally may remove a child from the custody of a parent without prior judicial authorization if the information they possess at the time of seizure provides reasonable cause to believe that the child is in imminent danger.  [Citations.]  Section 306, subdivision (a)(2) empowers a social worker to take a child into temporary custody under certain circumstances, without a warrant, if the child

_____

[4] Because the issue at a detention hearing concerns the risk to the child in the future, the issue whether the police officers had the right to remove the child from parental custody without a warrant and without prior judicial authorization is not necessarily litigated.  (See *Mabe*, *supra*, 237 F.3d at p. 1110 ["[t]he [later] juvenile court's findings are not relevant to whether a sufficient exigency existed at the time of the removal to justify the warrantless action because such an inquiry is to be based on the information that [the officer] had at the time"]; *Anderson–Francois v. County of Sonoma* (N.D.Cal.2009) 2009 WL 1458240, p. *6 [rejecting argument that a claim challenging the initial warrantless removal of a child was barred by findings during later juvenile dependency proceedings], aff'd (9th Cir.2011) 415 Fed.Appx. 6.)

9

is in immediate danger.  (*Ibid*.)  ['Any social worker in a county welfare department . . . may . . . (2) Take into and maintain temporary custody of, without a warrant, a minor . . . .who the social worker has reasonable cause to believe is a person described in subdivision (b) or (g) of Section 300, and the social worker has reasonable cause to believe that the minor has an immediate need for medical care or is in immediate danger of physical or sexual abuse *or the physical environment poses an immediate threat to the child's health or safety'*].)  (*M.L. v. Superior Court* (2009) 172 Cal.App.4th 520, 527, italics added; see *Arce, supra,* 211 Cal.App.4th at p. 1474.)

The circumstances described by the social worker in this case demonstrate that at the time she removed the child from Father's custody, Higgins had ample reason to believe that the toddler was in immediate danger of serious physical injury, as the physical environment posed an immediate threat to his health and safety.  Higgins knew that Father and the child were residing in the home of a known drug dealer in a house where dangerous dogs were kept; two dangerous dogs were present at the home and the child had access to them; Higgins found a pit bull that had bitten the homeowner in a room around the corner from the toddler; the owner of the dog appeared to be under the influence of drugs at the time and seemed unable to control the dog, faulting the owner for "inappropriately approaching" the dog.  Father, who was suspected of using methamphetamines again, appeared "oppositional and edgy" and his behavior and presentation led Higgins to suspect he was under the influence of methamphetamine or uppers. Dog feces in the home was accessible to the child and in Higgins's opinion presented a significant hygiene issue.  Finally, Father's suggestion that the child be given to the mother—whom both Higgins and Father knew to be a completely inadequate caregiver and who had stated her desire to be buried alive with her children, further supported Higgins's assessment that exigent circumstances warranted the immediate removal of the child.  That the quick sweep of the home by the police did not turn up drugs or guns, did not eviscerate the exigent circumstances upon which the warrantless removal was based.

10

## II. Jurisdiction

Father contends there was insufficient evidence to support the jurisdictional findings made by the court.  Specifically, Father contends there was no verifiable evidence that he was using drugs; the reported criminal history was untrue; no drugs or guns were found in the home; and the dogs were secured away from the child who appeared to be appropriately supervised.  We disagree.

"At the jurisdictional hearing, the dependency court's finding that a child is a person described in section 300 must be supported by a preponderance of the evidence. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.)  We review the dependency court's jurisdictional findings for substantial evidence, and review the evidence in the light most favorable to the dependency court's findings and draw all reasonable inferences in support of those findings.  [Citation.]" (*In re John M.* (2013) 217 Cal.App.4th 410, 418.)

Section 300, subdivision (b) provides a basis for jurisdiction where "[t]he child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . ." (*Ibid.*)  As we said in *In re Rocco M.* (1991) 1 Cal.App.4th 814:  A jurisdictional finding under section 300, subdivision (b) requires "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*Id.* at p. 820.)  "Subdivision (b) means what it says.  Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness." (*Id.* at p. 823.)

Nevertheless, "[t]he court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843; accord, *In re T.V.* (2013) 217 Cal.App.4th 126, 133.)  In determining whether circumstances at the time of the hearing subject the child to the defined risk of harm, the court may consider past events in determining whether the child needs the court's protection.  (*In re T.V.,* at p. 133.)  "A parent's past conduct is a good

predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' [Citation.]" (*Ibid.*)

In evaluating risk based to the child, a juvenile court should consider the nature of the conduct involved and all surrounding circumstances. " 'It should also consider the present circumstances, which might include, among other things, evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs, or other steps taken, by the parent to address the problematic conduct in the interim, and probationary support and supervision already being provided through the criminal courts that would help a parent avoid a recurrence of such an incident. The nature and circumstances of a single incident of harmful or potentially harmful conduct may be sufficient, in a particular case, to establish current risk depending upon present circumstances.' (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1025-1026.) We must have a basis to conclude there is a substantial risk the parent's endangering behavior will recur." (*Id.* at p. 1026.)" (*In re John M., supra,* 217 Cal.App.4th at pp. 418-419.)

Here, substantial evidence supporting the court's jurisdictional finding was provided by evidence that Father, who had a criminal history involving drug abuse and violence, among other things, was again using methamphetamine; that he had engaged in an angry and threatening verbal altercation with the grandfather in the presence of the child, who was very frightened; and that he had taken the child to live in a home of a known drug dealer, in which two very dangerous dogs were present and accessible to the child. At the time of the jurisdiction hearing, Father evidenced no understanding of the risk to which he had exposed his son and maintained he had done nothing wrong and should not have to address any of the issues of concern to the Agency, including anger management, possible substance abuse, or parenting inadequacies. He showed no understanding of the depth of his son's disappointment when Father simply failed to show up at a visit.

12

Father maintains that there was inadequate evidence of his resumed substance abuse. He argues that an "empirical or verifiable diagnosis" is required, relying on cases such as *In re Destiny S.* (2002) 210 Cal.App.4th 999 and *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322 (*Jennifer A.*). These cases are clearly distinguishable.

*In re Destiny S, supra,* 210 Cal.App.4th 999, involved the taking of jurisdiction of an 11-year-old child under section 300, subdivision (b), based on the mother's drug use. Mother admitted a history of methamphetamine and marijuana use and told the social worker she smoked marijuana on a weekly basis, but not around the child. She tested positive for marijuana and methamphetamine on October 11, at which time the department took Destiny from mother and placed her with her maternal grandmother. The mother was ordered to submit to weekly drug tests. Uncontradicted evidence at the jurisdiction hearing showed Destiny was a healthy, happy preteen, who wanted to return to her mother. All five of the drug tests to which the mother submitted between November 11 and January 12 were negative. The Court of Appeal reversed the jurisdictional order on the grounds that "a parent's use of marijuana '*without more*,' does not bring a minor within the jurisdiction of the dependency court. [Citation.] The same is true with respect to the use of hard drugs. [Citations.] Instead, the [department] had to present evidence of a specific, non-speculative and substantial risk to Destiny of serious physical harm. [Citation.]" (*Id.* at p. 1003.) The appellate court concluded that there was no evidence in the record that mother's drug use caused her to neglect the child, who appeared to be thriving. Finally, the mother had tested clean for marijuana and methamphetamine for three months. (*Id.* at p. 1004.)

Here, of course, the court did not take jurisdiction over the child because of Father's use of medical marijuana or his suspected return to methamphetamine use, "without more." The "more" was evidence of Father's behavior, including his behavior toward this young child—screaming at the two year old to "shut the fuck up" in the mornings, shouting and behaving aggressively toward the grandfather in the child's presence and to the child's distress, and most seriously, his taking the child to the home of a suspected drug dealer, where dangerous dogs were present, insufficiently controlled,

13

and accessible to the toddler. This evidence of risk of harm was nonspeculative and substantial.

*Jennifer A., supra*, 117 Cal.App.4th 1322, 1326, was a case in which mother petitioned for writ of mandate, seeking relief from a juvenile court's order that terminated reunification services, not an order taking jurisdiction. In *Jennifer A.*, the mother had complied with her case plan, had completed parenting classes and counseling. She had missed no counseling sessions. She was permitted daily, unmonitored visits and her therapist confirmed that she was far removed from leaving the children unattended—the behavior that had triggered jurisdiction. Over all, the mother was in general compliance, had kept appointments, responded to comments from the social worker and informed him of pertinent changes. There was no evidence that mother was using drugs at the time she cared for the children or that she was not an adequate caretaker. (*Id.* at p. 1342.) The only real issue was that of 95 twice-weekly testing obligations, mother tested positive for marijuana once, was unable to void once, had missed nine drug tests, and gave diluted specimens five times. The missed tests were considered to be positive tests, but the appellate court held that her completion of about 84 drug-free tests was sufficient to avoid termination of her parental rights. (*Id.* at p. 1343.) She was not required to demonstrate perfect compliance. (*Ibid.*) The children were removed because she had left them alone to go to work. Although there was some concern that she might have an unresolved substance abuse problem that affected her parenting, the court observed that was not the reason the children were detained and that the juvenile court's finding that return of the children would create a substantial risk of detriment to their safety, protection or physical or emotional well-being was not supported by substantial evidence. (*Id.* at pp. 1345-1346.) The court also observed that there was no evidence presented to establish that the mother had "displayed clinical substance abuse, that is, '[a] maladaptive pattern of substance use leading to clinically significant impairment or distress . . . occurring within a 12-month period.' [Citation.] No medical professional diagnosed Mother as having a substance abuse problem, no medical professional testified at the 18-month review hearing, and there was no testimony of a clinical evaluation. 'We have no

14

clinical evaluation, no testing to indicate [substance abuse], just the opinion of the mother's social worker and a therapist.' (*Blanca P. v. Superior Court* [(1996)] 45 Cal.App.4th [1738,] 1751.)" (*Jennifer A.,* at p. 1346.) The court also emphasized that there was no testimony linking the mother's marijuana and alcohol use to her parenting judgment or skills. In the social worker's many contacts with the mother, "she never seemed to be under the influence of alcohol or drugs. Most critically, the social worker testified Mother did not have a drug problem that affected her parenting skills. Th[is] evidence was insufficient to support a finding Mother could not provide a home 'free from the negative effects of substance abuse.' (§ 300.2)" (*Jennifer A*., at p. 1346.)

To extract from this case the proposition that a court must have an "empirical or verifiable diagnosis" of the parent's substance abuse before taking jurisdiction over the child in the circumstances here stretches *Jennifer A., supra,* 117 Cal.App.4th 1322, far beyond its facts. Here, unlike *Jennifer A.,* family members, including the grandfather and Father's sister, noticed that Father had begun to exhibit behaviors and patterns he had previously exhibited when he abused methamphetamines and alcohol. He slept at inappropriate times, left his toddler to roam the house without supervision while he slept, his pupils were dilated, he was often angry and impatient and would tell his son and parents to "fuck off" and leave him alone. When his parents confronted him regarding his possible resumption of methamphetamine use, they were met with anger, threats and hostility by Father The grandfather's testimony concerning Father's behavior, including his recent volatility, which in grandfather's experience indicated Father's return to methamphetamine, and the social worker's observations of Father's behavior during her interaction with him were sufficient to raise a concern about Father's return to substance abuse at this point, particularly in light of Father's history of drug abuse. Father's persistent failure to cooperate with the Agency on assessments for substance abuse or anger management, drug testing, visitation, appointments with social services or other suggestions that would enable the court to have confidence that the child could be safely returned to his custody provides further evidence that the child was at substantial risk. The main risk to the child was Father's having placed the him in an environment that was

15

clearly dangerous to the two-year-old's physical safety and well being. This behavior, coupled with Father's adamant refusal to recognize that his behavior had placed the child at risk and his refusal to cooperate with the Agency in nearly every respect, warranted the court's findings and its declaring the child a dependent child under section 300, subdivision (b).

### III. Disposition

Father contends the court erred in removing the child from his custody. He contends "there was insufficient evidence that met the clear and convincing standard of proof necessary to have [the child] removed."

Initially, we point out once again that although the standard in the trial court was "clear and convincing" evidence, our appellate standard of review is "substantial evidence," not clear and convincing evidence. (*In re Henry V*. (2004) 119 Cal.App.4th 522, 529.) As described above, the record contains substantial evidence warranting the court's removal of the child and its refusal to place the child with Father at the time of the jurisdiction and detention proceedings.

As part of his argument regarding disposition, Father also contends services were available to prevent removal of the child from his custody and that Father's offer to immediately vacate the dangerous home and stay with the child's godmother across the street should have been explored. This argument founders at the outset, as the social worker did not recall Father making such a request, but rather recalled that Father asked to have the child placed first with the child's mother, despite Father's knowing that she was not fit to care for the child. The credibility of Father and the social worker were determinations for the trial court to make. The court need not have believed that Father made such an offer. Furthermore, the question is not whether the social worker should have allowed Father to take the child to the godmother's home upon initial removal. Rather it is whether substantial evidence supported the removal of the child from Father's custody at disposition. We conclude that it did.

Although he contends services were available to prevent removal of the child, at the point of the disposition hearing, Father had rejected participating in or receiving any

16

services, including assessments for substance abuse and anger management, and had even gone so far as to stop visiting with his son because he didn't feel their visitation should be supervised. To argue on appeal that services were "available" to avoid removal of the child ignores the demonstrated fact of his refusal to participate in such services up to that point.

Substantial evidence on this record supports the court's continued removal of the child and refusal to place him with Father at disposition.

The jurisdiction and disposition orders are affirmed.


_____
Kline, P.J.


We concur:


_____
Haerle, J.


_____
Richman, J.

17